251 F.2d 643
 102 U.S.App.D.C. 152, 23 P.U.R.3d 96
 FLORIDA ECONOMIC ADVISORY COUNCIL, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Coastal Transmission
Corporation, Houston Texas Gas and Oil Corporation, Florida
Railroad and Public Utilities Commission, Florida
Development Commission, Intervenors.
 Nos. 13833, 13952.
 United States Court of Appeals District of Columbia Circuit.
Argued Sept. 16, 1957.
Decided Dec. 4, 1957, Dissenting Opinion Dec. 12, 1957,
Petition for Rehearing Denied Jan. 9, 1958.
 
 Mr. Bryce Rea, Jr., Washington, D.C., with whom Mr. Donald E. Cross, Washington, D.C., was on the brief, for petitioner. Mr. Edgar Watkins, Washington, D.C., also entered an appearance for petitioner in No. 13,952.
 Mr. Howard E. Wahrenbrock, Solicitor, Federal Power Commission, with whom Messrs. Robert Lee Russell, Assistant General Counsel, Federal Power Commission, and Oscar Earl Reed, Attorney, Federal Power Commission, were on the brief, for respondent. Mr. Willard W. Gatchell, General Counsel, Federal Power Commission, also entered an appearance for respondent in No. 13,833.
 Mr. Leon M. Payne, Houston, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of Court, with whom Mr. Dale E. Doty, Washington, D.C., was on the brief, for intervenor Coastal Transmission Corporation, argued for intervenors Coastal Transmission Corporation, and Houston Texas Gas and Oil Corporations.
 Messrs. Theodore Rinehart, Tulsa, Okl., Dale E. Doty, Norman E. Duke, Washington, D.C., and Robert M. Scott, Washington, D.C., were on the brief for intervenor Houston Texas Gas and Oil Corporation.
 Mr. R. Y. Patterson, J., Tallahassee, Fla., with whom Messrs. Cecil A. Beasley, Jr., and Eugene B. Thomas, Jr., Washington, D.C., were on the brief, for intervenor Florida Railroad and Public Utilities Commission.
 Messrs. Cecil A. Beasley, Jr., and Eugene B. Thomas, Jr., Washington, D.C., were on the brief for intervenor Florida Development Commission.
 Before BAZELON, FAHY and BURGER, Circuit Judges.
 BURGER, Circuit Judge.
 
 
 1
 This is a petition to vacate Federal Power Commission orders approving a plan to pipe natural gas to Florida.[1] Petitioner is an association of various organizations engaged in the petroleum product (chiefly fuel oil) business, whose economic activities will be adversely affected by competition of natural gas.[2] Opposing petitioner in this court are respondent Federl Power Commission and four intervenors; viz., the two pipeline companies who jointly propose to bring natural gas to Florida,[3] and two official agencies of the Florida state government.[4]
 
 
 2
 Houston and Coastal, the two pipeline companies, desired to build and operate a natural gas pipeline running from Texas and Louisiana fields along the Gulf shore, and down the Florida peninsula to Miami. Coastal would buy gas from various Texas and Louisiana suppliers, and carry it to Baton Rouge. Houston would buy the gas from Coastal, pick it up in Baton Rouge, and carry it to Florida, where it would be resold to Houston's customers. This plan of sale and resale accounted for 40% of the gas to flow through the pipeline. The rest of the gas was to be merely transportation gas, not resale gas. That is, two Florida power companies[5] would buy gas direct from suppliers in the field, and Coastal and Houston would merely transport the gas for the power companies.[6] The power companies would pay Houston for this transportation service, and Houston would reimburse Coastal for its share of the costs.
 
 
 3
 Hearings were begun on July 9, 1956, before a Commission hearing examiner, to determine whether the proposal merited a certificate of public convenience and necessity.[7] Petitioner, having been granted leave to intervene, actively participated in these hearings. The hearings ended on November 28. On December 6, the Commission, concluding there was a need for haste, called for briefs and oral arguments from the parties, including petitioner, and on December 28 decided the case itself[8] without any intermediate decision by the hearing examiner. The decision granted the certificate, subject to certain conditions. Some of these conditions were later modified or removed without petitioner being heard.
 
 
 4
 Petitioner's attempts to persuade the Commission to change its mind, to be heard further, and to intervene in subsequent proceedings, were denied, and petitioner appealed to this court.[9] Its claims fall into two categories, substantive and procedural. Substantively, it claims the Commission's decision should be reversed (1) because not based on substantial evidence; (2) because there was no power to attach curative conditions to a defective proposal; and (3) because certain key issues were raised before but not decided by the Commission. Procedurally, petitioner claims it was denied a fair hearing in that (1) the intermediate decision by a hearing examiner was omitted; (2) the whole proceedings after the hearings were completed were infected by undue haste; and (3) petitioner should have been heard when the conditions were imposed on the pipeline companies, and later when they were relaxed. We find none of petitioner's contentions of sufficient merit to warrant reversal.
 
 I The Alleged Substantive Errors
 
 5
 Public Convenience. Petitioner claims there was no substantial evidence to support the Commission's decision that the proposal, as modified by conditions, was required by public convenience and necessity. We need not dwell on this, for we find in a valuminous record ample evidence supporting this conclusion. The pipeline will, for the first time, bring natural gas to peninsular Florida, and will reduce Florida's almost complete dependence on fuel oil. Florida wants the pipeline, and obviously needs it. Indeed, it would be fair to argue that aside from mechanics, public convenience and necessity are self-evident. It is true that the finding of public convenience and necessity was conditioned on certain deficiencies being corrected, but, as conditioned, the finding is supported by substantial evidence.
 
 
 6
 Conditions. Next, petitioner questions whether the Commission has authority to transform a defective proposal[10] into a valid one by the addition of curative conditions. The argument is made that the Commission may attach conditions to valid proposals, but not to invalid proposals such as the present one would be, but for the conditions. It is sufficient to say that the Natural Gas Act specifically authorizes the grant of a certificate subject to 'such reasonable terms and conditions as the public convenience and necessity may require.'[11] We see no error here.
 
 
 7
 Suppliers' Rates. Petitioner claims the Commission should have held a rate hearing to determine the lawfulness of the rates to be charged by the gas suppliers. But this inquiry may be resolved in a rate proceeding rather than in a proceeding for a certificate of public convenience and necessity, and the Commission did not abuse its discretion in declining to consider the matter in the instant proceeding.[12] The rates are subject to the Commission's continuing jurisdiction, and, whenever sufficient reason appears, they may be taken up. Petitioner cites City of Pittsburgh v. F.P.C.[13] as requiring the Commission to consider these rates now. That case is not applicable because future correction of the alleged defects was not possible under the circumstances presented in that case. Here, the rates in question may always be corrected, if need be.
 
 
 8
 The Power Companies. Petitioner claims that one of the power companies and its suppliers fall under Commission jurisdiction, and must be certificated. The assertion is that the matter must be dicided now, and not later, because it is possible that certification of the power company or its suppliers would lead to cancellation of the power company's promise to use 20% of the capacity of the pipeline, and without this promise, the basis of the grant of the certificate would fall. It is true that the original contract between the power company and Houston contained a cancellation clause which lends color to petitioner's assertion that the danger of cancellation would be great if the Commission did exert jurisdiction. But this cancellation clause no longer exists; it has been deleted in accordance with the Commission's conditions. The Commission therefore thought the pressent facts did not warrant deciding whether it had jurisdiction over the power company or its suppliers, and we are not inclined to disagree.
 
 
 9
 Unfair Trade Practices. Petitioner claims the proposal was infected by a violation of the unfair trade practices and anti-trust laws. The price to be paid by the power companies for the delivered gas was composed of two elements; the price paid direct to the suppliers for the gas itself, and the price paid to Houston for transporting it. The transportation price was subject to Commission jurisdiction, but the gas price was not. The gas price was initially set at such a level that it, plus the transportation price, was competitive with fuel oil. The gas price was subject to an escalator clause, and would go up or down in a fixed proportion to the amount fuel oil prices went up or down. That is, the gas price was based, not on cost, but upon fuel oil prices. It may not be lawful to make sales at prices based not on cost but on a competitior's price, 'for the purpose of * * * eliminating a competition.'[14] But even if not, the acts complined of occurred in an independent contract between the power company and its suppliers, none of whom are subject to Commission jurisdiction. Moreover, the price arrangement may in the light of factors not now before us be found reasonable. In these circumstances the public interest is best served by awaiting, rather than anticipating, th occurrence of a violation which can be dealt with adequately only in a proceeding in which the alleged violator is a party.
 
 II The Alleged Procedural Errors
 
 10
 There remains the question whether petitioner was accorded an opportunity to be heard, and to have its contentions considered.
 
 
 11
 Omission of the Intermediate Decision. Ordinarily, a hearing examiner hears the evidence, and makes findings of fact and a recommended conclusion; the Commissioners then pass upon the recommendations. But this procedure, while desirable and usually followed, is not inflexibly required. Section 8(a) of the Administrative Procedure Act[15] provides that the intermediate any case in which the agency finds upon any case in which due and timely execution the record that due and timely execution of its functions imperatively and unavoidably so requires.' The Commission found that unless a decision were reached by December 31, 1956, the whole proposal might fail through exercise of suppliers' options to cancel their obligations if the project were not certified by December 31.[16] There was substantial evidence to support this finding.[17] The Commission's holding that this circumstance warranted omission of the intermediate decision was not an abuse of discretion.[18]
 
 
 12
 The Expedited Proceedings. Petitioner claims that two defects resulted from the speed in which the hearings were concluded and a decision reached. First, it claims it had an unduly short amount of time in which to brief and argue its case. After the hearings had been in progress for over four months, with petitioner present and actively participating, petitioner on December 6 was asked to submit briefs by December 15 (actually December 17, as the 15th was a Saturday), and on December 13 was asked to submit oral argument on December 21. We do not find this so short a time, considering the need for dispatch, as to amount to a denial of substantial rights. There is no showing that due to the speed, petitioner overlooked any important points or was otherwise adversely affected.
 
 
 13
 Second, petitioner complains that the Commission decided the case too fast; that in the time available the Commissioners could not have read all the evidence and pondered all the issues.[19] It is not for the courts, short of flagrant extremes, to tell the administrative agencies how long they must ponder before coming to a decision. The time spent in considering the evidence cannot be held by us to be too little if it appears that the Commission has spent the time required to satisfy itself as to its findings and conclusions. We cannot say that either the statute or the Constitution was violated by the Commission in not consuming a longer time in considering and deciding the case. The vigorous dissent by the Commissioners Connole[20] and Kline serves to emphasize the close scrutiny given by the Commission. Errors, whether induced by haste or other factors, are always reviewable on appeal.
 
 
 14
 Conditions. The Commission found that the plan was defective as it then stood, but it found that if certain conditions were complied with, the defects would be cured. It granted the certificate subject to these curative conditions, without hearing what petitioner had to say about them. Petitioner says it should have been heard, because the conditions transformed the proposal into an entirely new proposition.[21] We think not. The conditions only resolved issues raised, argued and briefed in the hearing. They involved no surprises except insofar as they may have gone farther or not so far as petitioner would have wished.[22] For example, in the hearing, all parties, including petitioner, were heard on the issue of how much equity capital should be required. Later, the Commission decided the level should be 15%, and conditioned the grant of the certificate on meeting this requirement. No useful purpose would have been served by reopening the proceedings to hear petitioner argue that 15% was not proper.
 
 
 15
 Petitioner also protests that the Commission, without hearing petitioner, later modified some of these conditions. The Natural Gas Act[23] grants the Commission discretion to modify its orders without further hearings. On this record, we see no important issue on which petitioner was not heard.
 
 
 16
 While petitioner's business will no doubt be affected by the advent of natural gas, both petitioner and the pipeline companies can do business in Florida[24] and both are needed to serve the growing population and expanding economy of Florida. The 'injury' to petitioner is that it must share what has heretofore amounted to a power monopoly. Moreover, the injury to petitioner is not likely to be substantial. As petitioner's brief says, 'as against the overall fuel needs of the States of Florida, the volume of gas brought in would be meager.' In addition, the record discloses a legitimate need for expedition, and thus some abridgement of usual procedures would be justified. Of course, the need for speed, however important to vital economic interests in Florida, would not justify denial of protected rights of the petitioner. This record discloses nothing which warrants our disturbing the Commission's action and the orders of the Commission are
 
 
 17
 Affirmed.
 
 
 18
 BAZELON, Circuit Judge (dissenting).
 
 
 19
 It is in the public interest that the people of Florida receive natural gas service as expeditiously as possible. But hasty contrivance may make for a project of such doubtful feasibility as to delay rather than expedite the desired service. Moreover, a speedy conclusion, however desirable, is not to be achieved at the expense of procedural fairness. I would reverse the grant of these certificates because the Commission's procedure was unfair. The legality or feasibility of the certificated project are questions I need not reach as I view the case. Whatever doubts the record discloses as to those questions serve, however, to emphasize the significance of the procedural deficiencies.
 
 
 20
 Omission of Intermediate Decision Procedure
 
 
 21
 On December 6, 1956, after almost five months of hearings before a hearing examiner, in the course of which a record of some 20,000 pages was made, the Commissioner found 'that unless final action is taken by the Commission prior to December 31, 1956, the gas purchase contracts of Coastal will be subject to cancellation, and unless the intermediate decision procedure is omitted, it appears that a decision by the Commission cannot be rendered before December 21, 1956.' Accordingly, it ordered omission of intermediate decision procedure and undertook to 'render final decision in the proceedings.'
 
 
 22
 Section 8 of the Administrative Procedure Act, 5 U.S.C.A. 1007, reflected in the Commission's Rules of Practice and Procedure, 18 C.F.R. 1.30, 1.31, establishes the procedure by which administrative agencies are to decide proceedings before them. In general, it is contemplated that the officer who hears a case will render an initial decision, or, if the Commission itself renders the initial decision, the officer shall first submit a recommended decision. Prior to any initial or recommended decision, the parties shall file proposed findings and conclusions. Before final decision, the parties shall have the right to file exceptions to the initial decision. All rulings upon proposed findings or conclusions and upon exceptions are to be shown in the record.
 
 
 23
 This procedure gives reasonable assurance that the final decision of the agency will reflect the evidence produced before the hearing examiner and that issues fairly raised will have been considered and decided. It also produces an administrative record which is amenable to judicial review. The task we face in measuring the agency's final decision against 20,000 pages of evidence would have been immeasurably simplified had the issues been progressively sharpened at the various stages of the intermediate decision procedure. There can be no question that this procedure is generally desirable. There may, however, be occasional emergencies requiring a calculated risk of error in order to achieve a speedy decision. For such emergencies it is provided that the agency may omit the entire intermediate decision procedure in an application for an initial license[1] and may itself render a final decision on the record taken by the hearing examiner, if 'the agency finds upon the record that due and timely execution of its functions imperatively and unavoidably so requires.'
 
 
 24
 In the instant case, the Commission made this finding in the very words of the statute. The finding, as has been noted, was explained in terms of the possible cancellation of gas purchase contracts upon which the project depended, 'unless final action is taken by the Commission prior to December 31, 1956.' The Commission recognized that its action might make it seem that it was permitting applicants to control the procedure by fixing contract dates, but it asserted that it was really doing no such thing, rather 'giving primary consideration to the public interest.'
 
 
 25
 It is obvious, as the Commission recognized, that it is unjustifiable to forego the security of the intermediate decision procedure simply because applicants fix arbitrary contract dates, for that would presage an early end to the whole scheme of administrative procedure so painstakingly established by Congress. What the Commission found in this case, to justify omitting the initial decision procedure, over and above the applicants' shotgun contract dates, does not appear. And it is not for us, of course, to supply deficiencies in the Commission's findings.
 
 
 26
 If it were our function to examine the record for the purpose of determining what justification existed for omitting the intermediate decision procedure, my reading of the record would tend to undermine rather than support the Commission's findings that omission was 'imperatively and unavoidably' required. The record shows that, though the gas supply contracts gave the suppliers an option to cancel if the project were not certificated by a certain date, the date in question had originally been July 1956 in some of the contracts and had been extended. There is nothing in the record to show that the option date would not have been extended again. Nor was any evidence presented that the options to cancel would have been exercised if there were not a certificate by December 31, 1956. The possibility of cancellation, so far as appears from the record, never became more than a mere possibility. The Commission, indeed, found only that the contracts would 'be subject to cancellation,' not that they would be cancelled.
 
 
 27
 The lack of basis for the Commission's action is shown by subsequent events. The Commission found that the contracts would be subject to cancellation 'unless final action is taken by the Commission prior to December 31, 1956.'1A But, despite precipitate procedure, there was in fact no final action by the Commission prior to December 31, 1956. The Commission's Opinion No. 301 of December 28, 1956, found the proposal in 'substantial' respects not to mett the public convenience and necessity[2] and it offered a certificate only with conditions. It disclosed that 'although the conditions * * * are substantial, the alternative is to deny the applications.' The applicants found this conditional grant unacceptable. They applied, instead, on January 24, 1957, for elimination of some of the conditions. Not till February 21, 1957, did the Commission resolve the question of elimination of the controversial conditions. And not till March 22, 1957, did the applicants accept their certificates of public convenience and necessity. Not a single one of the gas suppliers, so far as the record shows, exercised its option to cancel its contract during this delay of almost three months beyond the shotgun date.
 
 
 28
 There was thus no justification for taking the calculated risk of error inherent in omission of the intermediate decision procedure. Moreover, by its subsequent actions, as I shall now show, the Commission so greatly enhanced the possibility of error as to invalidate the proceedings.
 
 The Decision
 
 29
 The hearings closed on November 28, 1956. The record of some 20,000 pages presumably reached the Commission on or after December 6, 1956, when it ordered omission of intermediate decision procedure.[3] Twenty-two days later the Commission issued its thirty-one page majority opinion and the five page dissent of two of its members. In that twenty-two day period, without the benefit of an initial or recommended decision prepared by the examiner who heard the evidence, or exceptions thereto filed by the parties, the five members of the Commission would have had to study the entire record, consider and decide the case, and prepare their opinions. Assuming that the Commissioners had no other functions to perform; assuming further that they commenced reading the record on November 28, 1956, as soon as the hearings closed and even before they had decided to omit the intermediate decision procedure; assuming further that hearing oral argument, reading the briefs filed by the parties, conferring, and writing the opinions took no time at all; and assuming finally that they worked every day, including Sundays and Christmas day; merely to have read the record, each of the five Commissioners would have had to read between 600 and 700 pages each day.[4] We need not, and I do not, undertake to decide how fast an administrative agency may work. It is our concern, however, to decide whether there has been a fair and substantial hearing. 'And to give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them.' Morgan v. United States, 1936, 298 U.S. 468, 481-482, 56 S.Ct. 906, 912, 80 L.Ed. 1288. Only by closing our eyes to reality can we hold that the Commission did 'consider and appraise the evidence' here.
 
 
 30
 Respondent argues but feebly against the arithmetical impossibility of a fair and substantial hearing.[5] Its position seems to be, however, that lack of a fair and substantial hearing is not prejudicial so long as the decision happens to be supported by the evidence. We cannot assume that extremely complex issues are correctly resolved by mere accident. And we should not assume that the Commission allowed its staff, which was fully familiar with the record through participation in the hearings, to play an undisclosed role in the decisional process. What respondent's argument comes to is that the lack of a substantial hearing can be remedied nunc pro tunc by having the reviewing court 'consider and appraise the evidence,' and in effect, re-promulgate the determinations which were invalid when made. That is not our function.[6]
 
 Post-Decision Proceedings
 
 31
 In its Opinion No. 301, issued on December 28, 1956, the Commission found the applicants' proposals deficient in respects which made them inconsonant with public convenience and necessity. It held that the applications as they stood would have to be denied. Instead of denying them, however, it offered the applicants an opportunity to file new tariffs, new service agreements and a new financing plan along lines suggested in the opinion and it proceeded to issue certificates of public convenience and necessity conditioned upon the filing of such revised proposals. Thereafter, the applicants applied for rehearing seeking elimination of some of the Commission's conditions and undertaking to comply with others. Petitioner sought to oppose this application, but its opposition was rejected by the Commission's secretary. Petitioner then appealed to the Commission from this rejection. On February 21, 1957, the Commission issued an order modifying the conditions it had imposed in its Opinion No. 301 and denying petitioner's appeal from the Secretary's refusal to accept its opposition.
 
 
 32
 The Commission held that a party's right to a hearing expires with the Commission's order granting a certificate, even a conditional one, and that subsequent proceedings in connection with the propriety of or compliance with the conditions may be ex parte. It said in its order of February 21, 1957:
 
 
 33
 'No party can question the Commission's power under Section 7(e) to 'attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require,' as the Act in terms provides. Clearly, under the statute, the only hearing required to support the imposition of a condition which is reasonable and required by public convenience and necessity is the specific and only hearing for which the pertinent section makes provision-- the hearing on the certificate application. That hearing was had, and was full and adequate. The record was extensive and on the basis of it the Commission could either accept the project as proposed or at its discretion impose the reasonable conditions the public convenience and necessity required to bring the tariff and financing proposals into conformity with the Act's standards. We chose the latter course.'
 
 
 34
 I note, but pass over, the Commission's seeming failure to reckon with the provision of 7(e) of the Natural Gas Act, 15 U.S.C.A. 717f(e), that, if it does not find that the proposal is required by the public convenience and necessity, 'such application shall be denied.' Nor do I think we need decide whether the power given the Commission by that section 'to attach to the issuance of the certificate * * * such reasonable terms and conditions as the public convenience and necessity requires,' authorizes the Commission to convert an invalid proposal into a valid one. What concerns me is an apparent subversion of the legislative scheme that contested applications for certificates of public convenience and necessity be examined under the flood-lights of an adversary hearing.
 
 
 35
 Congress intended, both by the Natural Gas Act and by the Administrative Procedure Act, that, when there are parties in interest asserting that the certificate applied for will not serve the public convenience and necessity, the parties should be given a fair and substantial hearing and the issues should be decided on the basis of evidence taken at such hearing. If that evidence supports a grant, the certificate should be issued. If it does not, the certificate should be denied. To the extent that the Commission has power to grant a certificate on condition that the proposal be amended, the certificate may be granted only if the evidence in the record supports it. The Commission may not, after finding from the evidence that a proposed project will not serve the public convenience and necessity, approve, ex parte and without additional hearing, a new proposal not covered by the evidence taken at the hearing. The Commission argued, in rejecting petitioner's opposition to the revised project, (1) that the only hearing required by law is 'the hearing on the certificate application'; and (2) that it has the power to grant a certificate upon any condition which is reasonable and required by public convenience and necessity. From this it reasoned that, when a proposal is found on the evidence not to serve public convenience and necessity, it need neither reject it nor hold further adversary proceedings to determine whether a revised proposal would serve public convenience and necessity; but that it may simply banish the opponents from the proceedings and thereafter negotiate in camera with the proponents for a desirable proposal. This is fallacious reasoning which makes a farce of administrative procedure.
 
 
 36
 Counsel for the Commission now defend the Commission's banishment of petitioner on a different ground. They argue that further proceedings were unnecessary, not on the technical ground that there had already been 'the hearing,' but because the revisions of the project were covered in and are amply supported by the evidence. But we must judge the Commission's action in the light of the reason it gave in taking it, not that of its counsel in defending it. Securities and Exchange Commission v. Chenery Corp., 1943, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626. If the evidence is indeed sufficient to support the revised project, we are entitled to have the Commission so find. Should we, absent such a finding, undertake to determine the sufficiency of the evidence, we should soon find ourselves in deep water. For example, in its Opinion No. 301, the Commission found, with respect to rates proposed to be charged the power companies for transportation of gas, that, 'although the evidence is not sufficient to enable a determination of precisely what the proper rate should be, it sufficiently supports the conclusion that Houston Gas' presently proposed rates are not designed to require each class of service to bear its proper share of costs.' Thereafter, in compliance with conditions imposed by the Commission, Houston Gas proposed to increase the transportation rate by two cents per thousand cubic feet. If we are to read the Commission's findings to mean that the evidence does not permit any determination of what the proper rate should be, it follows that there is nothing to support the sufficiency of the increased rate. If the Commission meant only that the 'precisely' proper rate could not be determined from the evidence, but that an approximately proper rate could be determined, perhaps the two cent increase brought the rate within the approximation. But, so to find, we should have to determine initially, from all the accounting exhibits and other evidence, what the approximately proper rate should be. That prospect does not persuade me to depart from the rule of the Chenery case.
 
 
 
 [1]
 Florida (except the northernmost parts) is the last remaining state of comparable size and importance without a supply of natural gas. It is dependent almost entirely on petroleum products (chiefly fuel oil) for its power needs
 
 
 [2]
 One of the purposes for which petitioner was organized was 'to fight this case.'
 
 
 [3]
 Coastal Transmission Corp., and Houston Texas Gas & Oil Corp
 
 
 [4]
 Florida Railroad and Public Utilities Commission, and Florida Development Commission. These agencies argued strenuously in favor of the pipeline, because it would favor industrial development in Florida, and because it would reduce Florida's dependence upon a single fuel, which could, in emergencies, be cut off
 
 
 [5]
 Florida Power & Light Co., and Florida Power Corp
 
 
 [6]
 In so doing the power companies and their suppliers could avoid Commission jurisdiction, and hence supervision of their activities
 
 
 [7]
 Section 7(c) of the Natural Gas Act, 15 U.S.C.A. 717c(c)
 
 
 [8]
 E.P.C. Opinion 301, decided three to two. One of the dissenters later joined the majority
 
 
 [9]
 15 U.S.C.A. 717r(b)
 
 
 [10]
 The Commission found the proposal defective as it then stood, in respect to transportation gas arrangements and financing plans. The Commission found no disqualifying inadequacy in respect to gas supply, markets, facilities and economic feasibility
 
 
 [11]
 15 U.S.C.A. 717f(e)
 
 
 [12]
 See Panhandle Eastern Pipe Line Co. v. F.P.C., 1948, 83 U.S.App.D.C. 297, 169 F.2d 881, certiorari denied 335 U.S. 854, 69 S.Ct. 81, 94 L.Ed. 402
 
 
 [13]
 City of Pittsburgh v. F.P.C., 1956, 99 U.S.App.D.C. 113, 237 F.2d 741
 
 
 [14]
 See, e.g. 15 U.S.C.A. 13a
 
 
 [15]
 5 U.S.C.A. 1007(a)
 
 
 [16]
 There were 47 contracts with 33 suppliers of gas, each with this termination option
 
 
 [17]
 So sought after is natural gas that the pipeline companies were fortunate to secure contracts for as much gas as they did. The record suggests that obtaining extensions beyond December 31 would have been touch and go, and if obtained at all, would have been at a higher cost. Our dissenting colleague says 'The lack of basis for the Commission's action (in omitting the intermediate procedure) is shown by subsequent events. The Commission found that the contracts would be subject to cancellation 'unless final cation is taken by the Commission prior to December 31, 1956." He then correctly points out that there was in fact no 'final action' for almost three months after December 31, and yet none of the suppliers cancelled their contracts. This, he implies, shows there was no real danger of cancellation. This does not follow. Th fact that the time limit was not met and no one cancelled does not show there never was any danger of this happening. Moreover, it would appear that the time limit was met. The contracts were conditioned not, as suggested, on 'final action' being had by December 31, but upon 'the obtaining * * * on or before December 31, 1956 * * * of a Certificate of Public Convenience and Necessity.' The certificate was in fact granted on December 28
 
 
 [18]
 See R.C.A. Communications, Inc., v. F.C.C., 1956, 99 U.S.App.D.C. 163, 238 F.2d 24, certiorari denied 352 U.S. 1004, 77 S.Ct. 563, 1 L.Ed.2d 549; cf. Channel 16 of Rhode Island v. F.C.C., 1956, 97 U.S.App.D.C, 179, 229 F.2d 520; Chotin Towing Corp. v. F.P.C., 101 U.S.App.D.C. , 250 F.2d 394, wherein we held that the intermediate decision procedure could not be abridged in an application not involving an initial license
 
 
 [19]
 The record was first certified to the Commission on November 16, and briefs and oral argument were submitted by December 21. The decision was handed down on December 28
 
 
 [20]
 In February, 1957, Commissioner Connole joined the majority in approving the application
 
 
 [21]
 McClatchy Broadcasting Co. v. F.C.C., 1956, 99 U.S.App.D.C. 199, 239 F.2d 19, certiorari denied 353 U.S. 918, 77 S.Ct. 664, 1 L.Ed.2d 665. That case allowed further hearings because there, modification of the construction permit was so substantial as to amount to issuance of a new and different permit, in regard to which McClatchy had not yet been heard. See Civil Aeronautics Board v. State Airlines, 1950, 338 U.S. 572, 70 S.Ct. 379, 94 L.Ed. 353, for a case upholding award of a certificate differing materially from that sought
 
 
 [22]
 See Interstate Power Co. v. F.P.C., 8 Cir., 1956, 236 F.2d 372, certiorari denied 352 U.S. 967, 77 S.Ct. 352, 1 L.Ed.2d 321
 
 
 [23]
 15 U.S.C.A 717r(a)
 
 
 [24]
 The Commission's opinion stated 'although it may be that (certain competitors) * * * may initially suffer economic losses, it reasonably appears that increased industrial and other activity in Florida resulting from the introduction of natural gas will yield offsetting benefits in the long run. We therefore conclude that the need and desire of the public in Florida for natural gas turns the scales against these competitng interests.'
 
 
 [1]
 Cf. Chotin Towing Corp. v. F.P.C., 102 U.S.App.D.C. , 250 F.2d 394
 1A That the contracts were conditioned on 'final action' by the Commission by December 31, 1956, rather than merely the issuance of a conditional certificate of public convenience and necessity was found by the Commission;--not, as footnote 17 of the majority opinion states, 'suggested' by me. It may be possible to construe the contracts to mean that any certificate, even a conditional one, would terminate the options to cancel. But the Commission did not so construe them. I do suggest that the court is not warranted in substituting its construction of the contracts for the construction adopted and acted upon by the Commission.
 
 
 [2]
 The dissenting Commissioners said: 'The conditions found necessary in the opinion and order of the majority confirm the fact that the project as proposed is economically impossible of completion.'
 
 
 [3]
 The record had been certified to the Commission on November 16, 1956, in connection with the motion for omission of the intermediate decision procedure. In certifying it, however, the hearing examiner pointed out that it was only partial, since a dozen witnesses remained to be cross-examined and one or more interveners or groups of interveners were still expected to present their affirmative cases
 
 
 [4]
 The respondent argues in its brief that most of the record deals with matters so 'noncontroversial' that 'there would be little practical need for their being read.' If that fact is true, the use of the intermediate decision procedure would have disclosed it. But the Commission, confronted with a raw record of evidence received by a hearing examiner as relevant and material, must assume that all of it is significant enough to be read. How the Commission was supposed to know which parts of the record there was 'little practical need' to read the respondent does not suggest
 
 
 [5]
 See note 4, supra
 
 
 [6]
 We need not delve deeply into the record to conclude that the determination that the public convenience and necessity requires the project is not as clearly supported by the evidence as respondent suggests. It is enough to refer to the opinion of the two dissenting Commissioners, which begins as follows:
 'The evidence and testimony of record, all fully tested on cross-examination and rebuttal, all fully briefed and argued, discloses the inherent weaknesses in this application. The conditions found necessary in the opinion and order of the majority confirm the fact that the project as proposed is economically impossible of completion. Even in the form which it would take if the conditions were met it would contain so many compromises with principle and rest on so much speculation for its success that the Act does not permit a finding that the public convenience and necessity requires its construction and operation.
 'Let one thing be clear at the outset. This statement is addressed to these particular projects, the one proposed and the one which would be created if conditions were met, and to those projects only. By no means do I oppose bringing natural gas into peninsular Florida nor do I disagree that the economy of the State would benefit from its introduction-- if it could be done on an economically sound basis. But the economy most emphatically would not benefit if the project to bring it there were not economically sound. And those in issue here are not. Accordingly I am reluctantly, but inevitably, forced to dissent.
 'The project as proposed is plainly impossible unless the Commission surrenders all significant control over matters of regulatory concern to contractual agreement between the applicant and the customer for 60% of its service. This, necessarily, the Commission has refused to do. I do not believe it should make the gesture of offering the unacceptable alternative. I feel the certificate is unacceptable because under its terms the principal customers, the power companies, cannot be expected to go along unless the Commission makes concessions in rate making principles which I do not feel are justified at this time on this record. And if they do not go along, the project is not feasible.'