**J. W. GOODWIN et al., Appellants,**

v.

**JACKSONVILLE GAS CORPORATION,**
**Appellee.**

**No. 18759.**

United States Court of Appeals
Fifth Circuit.

April 19, 1962.

Delbridge L. Gibbs, Jacksonville, Fla., Lawrence Dumas, Jr., Birmingham, Ala., for appellants.

Elliott Adams, Edward McCarthy, Jacksonville, Fla., McCarthy, Adams & Foote, Jacksonville, Fla., of counsel, for appellee.

Before TUTTLE, Chief Judge, and JONES and WISDOM, Circuit Judges.

JONES, Circuit Judge.

The appellants brought an action against the appellee in the District Court for the Southern District of Florida, basing jurisdiction solely on diversity of citizenship, and claiming $500,000.00 for breach of contract. The appellants are a firm of engineers. The appellee was, at the time of the making of the contract upon which suit was brought, engaged in the production and distribution of manufactured gas for fuel in the City of Jacksonville, Florida. On September 5, 1952, the parties entered into a lengthy written contract for the performance of specified services by the engineers. The agreement required the engineers to make preliminary surveys, studies, investigations, designs, and estimates of costs, and to make recommendations as to the facilities that would be required and the advisability of financing a natural gas pipeline to serve the company's gas distribution system. The engineers undertook by the contract to present engineering data to the Federal Power Commission. It was recited that the purpose of such studies was to determine a feasible method of bringing natural gas to the Jacksonville area. For the preliminary studies and recommendations the engineers were to be paid $25,000.00. This amount was paid and is not involved in the present controversy.

There are two portions of the agreement upon which the engineers base their claims, one of which is called the pipeline portion and the other is referred to as the distribution system portion. The pipeline portion of the agreement provided that when the supply of natural gas had been assured to the Jacksonville area, the engineers would furnish plans, specifications, estimates, proposals, notice to bidders and contract documents, for the construction of a pipeline which the company agreed to construct with diligence and dispatch under the supervision of the engineers who were to be paid a fee of 3% of the estimated cost on delivery of the plans and specifications, and a further fee of 3% of the construction cost for the supervision of the

work. In paragraph 7 of the agreement [1] it was provided that if "the proposed plan" called for the formation of a new company or the construction of a pipeline by an existing company, the Jacksonville Gas Corporation would assign the contract to the pipeline company and would make no agreement to buy natural gas from any pipeline company unless it would assume the obligations for the payment of the engineers, with a provision that if the plan proposed by the engineers was not successful, the company could buy natural gas from any pipeline company which would make it available to the Jacksonville area.

The so-called distribution system portion is in paragraph 8 of the agreement,[2]

---

1. "7. In the event the proposed plan calls for the formation of a new pipe line company, or the construction of a pipe line by an existing pipe line company, Jacksonville agrees that it will assign this contract, together with all of its rights acquired thereunder, to such pipe line company and that it will not execute a contract to buy natural gas from a pipe line company unless such pipe line company agrees to assume this contract and carry out its provisions, including compensation for engineering services to Engineers as herein provided. Provided, However, that, in the event the proposed plan to supply natural gas to the Jacksonville, Florida, area through the efforts of the Engineers is not successful, Jacksonville shall be at liberty to contract with and purchase natural gas from any other pipe line company which may make natural gas available to the Jacksonville, Florida, area. In the event Jacksonville shall assign its rights under this contract to another pipe line company which shall undertake and agree to pay the compensation to Engineers for the engineering services, Engineers agree that Jacksonville shall be reimbursed the $25,000.00 paid under Paragraph 2 hereof from the first moneys paid to the Engineers by said pipe line supplier who takes over and assumes this contract."

2. "8. When a supply of natural gas has been obtained for the Jacksonville, Florida, area, from any source, and the construction of pipe line has been assured, Jacksonville agrees to employ Engineers as the engineers for the design and construction of the expansion of Jacksonville's distribution system. Jacksonville agrees that the distribution system shall be extended to substantially cover the metropolitan area of the City of Jacksonville, Florida, Provided, However, that all plans for the expansion or extension of its distribution system shall be submitted to and approved by Jacksonville and no detailed plans and specifications shall be prepared for any area unless specifically authorized by Jacksonville. For such services Jacksonville agrees to pay Engineers, (a) upon delivery of the preliminary plans estimated cost and Engineering Report for the expansion of its distribution system $25,000.00; (b) upon delivery to it of detailed plans and specifications for the construction of the expansion of its distribution system, or for any proportionate part thereof, in the event the work is to be done by steps, 3% of the total estimated cost of that part of the work for which detailed plans and specifications are submitted, or 3% of the total contract price of such improvements, of which the $25,000.00 previously paid shall be a part, whichever is the lesser. It is contemplated that all percentage fees to be paid the Engineers must be paid from the proceeds of the financing undertaken for the construction program (except the $25,000.00). In the event the pipeline cannot be constructed by reason of governmental rules or regulations or restrictions on the use of materials, or by reason of national emergency, and so long only as such conditions exist, Jacksonville shall have no responsibility to pay the Engineers their fee for the preparation of the said detailed plans and specifications. Provided, however, that if the conditions aforesaid do not prevent the construction of said pipeline and Jacksonville, without cause, should fail or refuse, within a period of ninety (90) days after receiving the plans and specifications, to enter into a contract for such construction, then, in that event, Jacksonville shall pay to Engineers their 3% fee on the estimated cost of the improvements, on that portion of the improvements then scheduled to be constructed, said estimate to be made by Engineers. Jacksonville shall have the option, but shall not be obligated, to retain Engineers to supervise the construction of the extension of its distribution system and agrees to pay 3% of the total construction cost for each project or projects for active supervision, or 1% of the total construction cost of each project or projects, if it should elect to

in which the company agreed that, when a supply of natural gas had been obtained for the Jacksonville area, it would employ the appellants as the engineers for the design and construction of the expansion of the company's distribution system with a proviso that no detailed plans should be prepared unless specifically authorized by the company. The company agreed to pay $25,000.00 on delivery of preliminary plans, and a fee of 3% of the estimated cost on delivery of detailed plans, less the $25,000.00 payable for preliminary plans.

In January of 1953 the engineers submitted to the company an "Engineering Report" of "Various Plans for Bringing Natural Gas" to Jacksonville. Eight plans were included, some of which were only slightly different from one or more of the others. All of these contemplated bringing gas from a pipeline source either north or northwest of Jacksonville. The activities of the engineers became more and centered, as time went by, upon a modification of the number 2 plan for acquiring natural gas from South Georgia Natural Gas Company which had negotiated for a supply of gas from Southern Natural Gas Company. This plan contemplated an extension to Jacksonville of South Georgia's projected pipeline to Ellaville, Florida. This extension, the engineers represented, might be built by South Georgia or by some other company. It was indicated that this project would provide for delivery of gas to the company at city gate of Jacksonville. The Houston Texas Gas and Oil Corporation entered the picture and applied to the Federal Power Commission for a certificate to authorize the bringing of natural gas from Louisiana to Florida. Its plan, ultimately consummated, provided for bringing gas to the Tampa area, Central Florida, and the Lower East Coast of Florida, as well as to Jacksonville. The company became interested in this program as it had been in others. The engineers continued to urge consideration of South Georgia and to discourage consideration of Houston. They referred to a Houston letter as "very cleverly written." They expressed doubts that Houston had a supply of natural gas or customers to use it. A proposed rate quoted by Houston was designated by the engineers as a promotional rate. The engineers commented that Houston was doing its best to make its information look good. The company suggests that the attitudes of the engineers with respect to South Georgia and Houston may have resulted from the fact that J. W. Goodwin, the managing partner of the engineers, owned 10% of the stock of South Georgia with an option to purchase 5% more, was one of its engineers, and had been on its board of directors. We are not required to consider this question.

In 1954 the engineers represented to the company that if South Georgia could get an additional supply of gas, and if it could finance the construction of an extension of its pipeline it would be possible for South Georgia to bring natural gas to Jacksonville by 1956, depending, however, upon cooperation of Southern Natural and other factors which the engineers did not specify. Early in 1956 the company intervened in the proceedings of Houston before the Federal Power Commission. Conferences were held between representatives of the company and representatives of Houston, some of which were attended by one of the engineers. During these and other conferences Houston negotiated for the purchase of the control of the company's stock. The company requested the engineers to revise and bring down to date their preliminary studies with respect to the five areas which had been previously designated. At the company's request one of the engineers testified at the hearing of the Houston application before the Federal Power Commission. On December 28, 1956, the Commission issued its opinion and order granting the certificate. 16 F.P.C. 118. The order was modified on February 21, 1957. 17 F.P.

employ engineers for consultive supervision only, said compensation to be paid

monthly, based on the contractors' approved estimates of the work done."

C. 303. The Court of Appeals for the District of Columbia affirmed the Commission. Florida Economic Advisory Council v. Federal Power Commission, 102 U.S.App.D.C. 152, 251 F.2d 643. Certiorari was denied on May 19, 1958. 356 U.S. 959, 78 S.Ct. 996, 2 L.Ed.2d 1066. The securities for the financing by Houston of its pipeline were registered with the Securities and Exchange Commission on August 19, 1958.

In June of 1957 and again in June of 1958, the engineers billed the company for the $25,000.00 for the preliminary plans for the extension of the company's distribution system pursuant to paragraph 8 of the contract. The company rejected these demands on the ground that the payment was not due until a supply of gas was assured. The engineers were reminded, in a letter to them from counsel for the company dated June 9, 1958, of the contract provision that no detailed plans and specifications should be prepared for any area unless specifically authorized by the company. The engineers proceeded to prepare detailed plans and specifications for the extension of the company's distribution system in the five designated areas, and this was done despite the reminder in the letter of the company's counsel and without any advice to or consultation with the company as to the preparation of the detailed plans and specifications. To a considerable extent the 1956 data had not been rechecked or revised. On October 17, 1958, less than two months after a supply of gas had been assured by the registration of Houston's securities, the engineers sent to the company detailed plans and specifications, which were followed on October 20, 1958, by a letter with which the engineers enclosed a bill with one item of $25,000.00 covering the preliminary plans, and another of $133,469.30 representing 3% of the engineers' estimated cost of the extensions as proposed in their plans and specifications, less a credit for the $25,000.00. In the letter the engineers announced, "In the event we do not receive check to cover this invoice on or before Monday November 10, 1958, this

is to advise that we intend to instigate legal proceedings to collect the full amount due under this contract, including such damages to which we may be entitled." On January 20, 1959, suit was instigated.

The suit of the engineers is for breach of contract. Federal jurisdiction is based upon diversity of citizenship. A claim was asserted for $25,000.00 in payment for the preliminary plans for an expansion of the company's distribution system. The court granted a motion for a directed verdict upon this claim and judgment was entered. This phase of the litigation has been disposed of.

The claim was made by the engineers that the company breached paragraph 7 of the agreement by the making of a deal with Houston to supply natural gas to the company without requiring Houston to obligate itself to use and pay for, or pay for without using, the services of the engineers in the planning and construction of the pipeline by which the gas was to be brought to Jacksonville. The parties agreed that if the engineers were entitled to recover on this claim, the damages should be $18,665.00. The issue on this part of the case was submitted to the jury by the following special interrogatory:

"Have the plaintiffs established by a preponderance of the evidence that defendant breached the terms of paragraph 7 of the agreement of September 5, 1952, by failing to require Houston Texas Gas and Oil Corporation to assume defendant's contract with the plaintiffs for engineering services in connection with the construction of the pipe line connecting Houston's pipe line to Jacksonville?"

The jury gave a "yes" to this interrogatory.

The engineers also sought to recover, under paragraph 8 of the agreement, an amount equal to 3% of the cost as estimated by them of the extension of the company's distribution according to the engineers' plans and specifications deliv-

ered in October 1958. This amount was computed by the engineers as being $133,469.30. The question was submitted to the jury by a special interrogatory as follows:

"Have the plaintiffs established by a preponderance of the evidence that the defendant breached the terms of paragraph 8 of the agreement of September 2, 1952, by failure to pay for the plans and specifications furnished by the plaintiffs to the defendants on October 20, 1958?"

The jury's answer was "No." A judgment of the court, signed by its clerk, was entered for the separate amounts of $25,000.00 and $18,655.00, with interest on the first sum, and for costs. The engineers moved for a new trial. The company moved for a judgment notwithstanding the verdict. The court denied the engineers' motion, granted the company's motion and amended the judgment by striking the provision for the recovery of $18,665.00. From the judgment, as amended the engineers have appealed.

The question as to whether the district court erred in entering a judgment notwithstanding the verdict on the engineers' claim of a breach of the paragraph 7 covenants involves a determination of the respective duties and obligations of the parties as set forth in the agreement. This is a matter of construction of the language used. Also involved is the question as to whether there was sufficient evidence to show a breach by the company of a duty owing to the engineers. The engineers were required to make preliminary surveys and recommend a plan for securing a supply of natural gas and to determine a feasible method of bringing natural gas to Jacksonville. They undertook to attend Federal Power Commission hearings and to assist the company's attorneys and officials in such hearings. For these services the engineers were to be paid and have been paid the sum of $25,000.00. For services in preparation of detailed plans and specifications for the construction of a pipeline, supervising bids, a contract and the construction work in the laying of a pipeline the engineers were to receive 3% of the contract price. If the company failed or refused, without cause, to build a pipeline then it would owe the engineers 3% of their estimated cost of the pipeline.

■■ Paragraph 7, hereinabove quoted, obligates the company to require any pipeline company, whether new or existing, which might build a pipeline, to assume the undertakings of the company to the engineers including the promise for the payment of compensation. There is, however, a proviso that, in the event the proposed plan to supply natural gas to the Jacksonville area through the efforts of the engineers is not successful the company could contract with and purchase gas from any pipeline company which might make natural gas available to the Jacksonville area. Houston made gas available to the Jacksonville area. For primary consideration is the query whether gas was made available pursuant to a plan through the successful efforts of the engineers. If not, there was no duty on the part of the company to require Houston to assume the obligations of the contract and hence no breach would result from the failure to require the assumption of any contract obligations. Of the eight plans proposed by the engineers, all contemplated the bringing in of gas by connecting with existing or projected pipelines at points north or northwest of Jacksonville. None of them considered the possibility of bringing in gas from the west or southwest, which is the direction from which the pipeline of Houston came to the Jacksonville area. Three of the engineers' plans were designed to use natural gas to be supplied by South Georgia Natural Gas Company. It was the only one of the four possible sources of a supply of gas suggested by the engineers which indicated any interest in serving the Jacksonville area. It was the company in which Goodwin was interested. The engineers' plan finally narrowed down to a proposed extension to Jacksonville by South Georgia of its then projected pipeline to Ellaville, Florida, where South Georgia had arranged to supply gas to an elec-

tric generating plant of Florida Power Corporation. The evidence all tends to show that the efforts of the engineers to bring natural gas to the Jacksonville area were unsuccessful; and that the bringing of natural gas to Jacksonville was not the result of the efforts of the engineers. It is an elementary rule that there must be at least a substantial performance or conditions precedent in order to authorize a recovery as for performance of a contract. 7 Fla.Jur. 197 Contracts § 130; Cohen v. Rothman, Fla. App., 127 So.2d 143. The entry by the district court of a judgment notwithstanding the verdict on the claim asserted under paragraph 7 of the contract was without error.

■■ It is urged by the engineers that it was error for the district court to exclude evidence that in a proceeding before the Federal Power Commission upon Houston's application for approval of its plan to bring gas to Jacksonville and elsewhere, and in a proceeding before the Securities and Exchange Commission upon Houston's application for approval of the issuance of securities to finance the pipeline to Jacksonville and elsewhere, officers of the company had testified that it intended to carry out the plans of the engineers. It is asserted that there was error in the exclusion of the portions of the prospectus of Houston which related to a proposed extension of the company's distribution system. Other similar evidence was excluded. The engineers say, in their brief, that although they "did not have a neatly typed letter authorizing in so many words the preparation of" the detailed plans and specifications, there was a course of conduct, to which the excluded evidence was relevant, which clearly, unequivocally and specifically authorized them to prepare those plans and specifications. The views of the district judge were expressed during argument upon a motion for directed verdict. The court commented:

"Certainly, somebody that knows they are in a law suit or they are preparing for a law suit, they should do what they think they are called on to do to put them in the best possible position in a law suit. And there was no serious idea in anybody's mind when the preparation of these plans were gone into, there could have been no serious idea in anybody's mind, that they would be accepted or that the bill would be paid. They were accompanied by a bill with demand for payment within ninety days or there would be a law suit, and a law suit followed, I think we figured it up, in ninety days.

"I sympathize with a professional man who has not been paid for contracted services. I do. But these engineers, these plaintiffs, did not prepare these plans and specifications under any assumption whatever that they would be accepted, that they were wanted by the defendant; on any assumption whatever but that they would be refused and that they had now laid the groundwork for a law suit. That is very apparent from what happened.

"My point is this: That whatever in the way of brains and physical material, ink, and drafting paper, and blueprint paper, and salaries, and wages, and withholding— or whatever went into the preparation of these plans, that went in as a gamble that they were going to get it back in a law suit; and not in any good faith, not on any assumption that the people owed it to them; that they had a right to do it.

"That's the only interpretation I can put on the contract, on their conduct. I don't want to belabor the point."

It is not, we think, material whether these views are justified. The preparation of the detailed plans and specifications was not to be undertaken unless specifically authorized. The specific authorization was a condition precedent to the preparation of plans and specifica-

362

tions, and, of course, to liability for payment. For the authorization to be specific it must be definite, explicit, particular and precisely formulated. 81 C.J.S. pp. 400, 401. The requirement for specific authorization could not be met by inferences drawn from testimony in the administrative procedures by which Houston sought to procure approval of its construction and financing programs. The testimony might have indicated an expectation of Houston and of its affiliate, the appellee here, to carry out the engineers' preliminary plans, but could hardly be regarded as showing a specific authorization from the company to the engineers to prepare the detailed plans and specifications. Representations to the Federal Power Commission or the Securities and Exchange Commission cannot be regarded as or take the place of the specific authorization required by the contract, particularly in view of the reminder to the engineers that they were not to prepare detailed plans and specifications without being authorized. The evidence was properly excluded.

The judgment of the district court is Affirmed.