**OKLAHOMA NATURAL GAS COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION,
Respondent,
Natural Gas Pipeline Company of America, et al., Intervenors.**

No. 13783.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 5, 1958.

Decided May 22, 1958.

---

Bazelon, Circuit Judge, dissented.

Mr. John S. Carlson, Tulsa, Okl., of the bar of the Supreme Court of Oklahoma, pro hac vice, by special leave of Court, with whom Mr. Norman A. Flaningan, Washington, D. C., was on the brief, for petitioner.

Mr. Robert Lee Russell, Washington, D. C., for respondent. Messrs. Willard W. Gatchell, General Counsel, Federal Power Commission, Howard E. Wahrenbrock, Solicitor, Federal Power Commission, and Alvin A. Kurtz, Attorney, Federal Power Commission, Washington, D. C., were on the brief for respondent.

Mr. Clarence H. Ross, Chicago, Ill., with whom Mr. John A. Kratz, Washington, D. C., was on the brief, for intervenor, Natural Gas Pipeline Co. of America.

Mr. Raybourne Thompson, Houston, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of Court, with whom Messrs. John J. Wilson, Washington, D. C., and Warren M. Sparks, Tulsa, Okl., were on the brief, for intervenor, Oil Drilling, Inc., et al. Mr. Frank H. Strickler, Washington, D. C., also entered an appearance for intervenor, Oil Drilling, Inc., et al.

Before BAZELON, DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

This appeal seeks review of an opinion and order of the Federal Power Commission (Commission), Opinion No. 299 and accompanying order of December 4, 1956, 16 F.P.C. 80, 16 PUR 3d 277 (1956), amendatory order of January 22, 1957, 17 F.P.C. 67, and order of January 31, 1957, 17 F.P.C. 85, in issuing certificates of public convenience and necessity pursuant to § 7(e) of the Natural Gas Act, as amended. (Acts of June 21, 1938, c. 556, 52 Stat. 824; February 7, 1942, c. 49, 56 Stat. 83; July 25, 1947, c. 333, 61 Stat. 459; 15 U.S.C.A. § 717f).

Natural Gas Pipeline Company of America (Natural), an intervenor in this proceeding, since 1931 has operated a natural gas pipeline from the Panhandle field in Texas to Joliet, Illinois, and, together with its affiliate, Texas Illinois Natural Gas Pipeline Company, supplies the entire natural gas requirements of the metropolitan Chicago area. Natural's existing pipeline, which has a capacity of 510,000 Mcf per day, is presently being operated at more than 98% load factor. The record shows that a growing and unsatisfied demand for natural gas exists in this area. Natural sought to accommodate this demand and, to accomplish this, contracted with three independent producers, Sunray Mid-Continent Oil Company, Warren Petroleum Corporation, and Oil Drilling, Inc., intervenors in this proceeding, to buy at an initial price of 13.9¢ per Mcf the large gas reserves of 78,000 Mcf per day which those producers had discovered in Jack and Wise Counties, Texas.

In October 1954, Natural and its proposed producer-suppliers (hereinafter referred to as Producers) made applications to the Commission for certificates of public convenience and necessity pursuant to § 7(e) of the Act. Natural's application sought permission to extend its Chicago-Texas Panhandle pipeline from Fritch, Texas, southeasterly through major gas-producing areas of southern Oklahoma to a point in Grandy County, Oklahoma, thence southerly to certain gas fields in Jack and Wise Counties in the north central part of Texas, a distance of some 350 miles. Producers' applications sought permission to sell and deliver their gas to Natural in accordance with their contracts with Natural.

Lone Star Gas Company (Lone Star), which had been the sole large buyer of gas in northern Texas, filed a rival application under § 7(c) of the Act. Under this proposal Lone Star would supply 80,000 Mcf of gas to Natural at Fritch, Texas, through a 230.5-mile pipeline which would be built from its existing line in Cotton County, Oklahoma.

Oklahoma Natural Gas Company (Petitioner) is, and has been for over fifty years, engaged in the distribution of natural gas in Oklahoma. It serves approximately 335,000 customers and uses approximately 125 billion cubic feet of natural gas annually. It now purchases, and is expected in the future to purchase, approximately 60% of its required gas supplies in southern Oklahoma at a maximum price of 10¢ per Mcf.

In the proceedings before the Commission, permission to intervene in each and all of the proceedings was granted by the Commission to Petitioner, Cities Service Gas Company, Upham Gas Company, Consolidated Gas Utilities Corporation, Central Illinois Electric and Gas Company, Iowa Power and Light Company, State Fuel Supply Company, and the City of Chicago, Illinois. Natural and Lone Star each were intervenors in the proceedings involving the application of the other.

The gas utility intervenors opposed the granting of certificates and, alternatively, asked that, if certificates were granted to Producers, such certificates be conditioned on Producers receiving no more than 11¢ per Mcf of gas, which was alleged to be the prevailing price in the area of Jack and Wise Counties.

After separate hearings on the two proposals, the proceedngs were consoli-

dated. The examiner rendered a consolidated decision which rejected the application of Lone Star and approved those of Natural and Producers, subject, however, to a condition which effected a reduction in the initial price to be charged Natural by Producers. The examiner was of the opinion that such a condition was required by the Commission's opinion in In re Cities Service Gas Co., et al., 12 PUR 3d 3 (1955), which he regarded as controlling and not restricted to the facts in that case.

All parties excepted to the examiner's decision. The Commission permitted the proceedings to be reopened for the introduction in evidence of matters that had occurred since the close of the initial hearings, including amendments to the contracts with Producers reducing their initial price by 1¢ per Mcf with provisions respecting price escalation.

After further testimony, the Commission ordered the omission of an intermediate decision of the examiner and issued its order of December 4, 1956. That order again granted the applications of Natural and Producers without any condition as to price, but it did provide:

> "The grant of the certificates herein shall not be construed as a waiver of the requirements of Section 4 of the Natural Gas Act, or of Section 154 of the Commission's Rules and Regulations thereunder requiring the filing of rate schedules for the service herein authorized, and is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against the applicants. Further, the action taken in this proceeding shall not foreclose nor prejudice any future proceedings or objection relating to the operation of any price or related provision in the gas purchase contracts herein involved."

The order again denied Lone Star's application for construction of its proposed facilities. The Commission, however, found that there was demand for gas beyond the supply now authorized, and authorized Lone Star to sell to Natural an average daily volume of 80,000 Mcf of natural gas and a daily maximum of 100,000 Mcf at the point of intersection between Lone Star's existing pipeline and Natural's proposed line in southern Oklahoma. The Commission also required Natural, in the event of Lone Star's acceptance of such authorization, to file with the Commission an application for a certificate of public convenience and necessity for facilities necessary to increase the sales capacity of its system between Fritch, Texas, and Joliet, Illinois, by 100,000 Mcf per day. Lone Star accepted the plan, and Natural filed its application pursuant to the Commission's order. Only Petitioner has appealed from the Commission's decision.

█ Under § 7(e) of the Natural Gas Act, the Commission has authority to issue a certificate to any qualified applicant if it finds that the applicant is able and willing properly to perform the proposed service and that the service "is or will be required by the present or future public convenience and necessity." Of course, the section also authorizes the imposition of conditions.

Petitioner's main contentions are that the Commission erred in granting the certificate to Producers without imposing a price condition, because, it was contended, Natural's proposed price exceeded the prevailing price in southern Oklahoma, and that the Commission did not make a finding that the increased rate proposed by Producers was "just and reasonable," as required by § 4(a) of the Act, 15 U.S.C.A. § 717c(a). That section requires that all rates and charges made or received by any natural gas company shall be "just and reasonable," and provides that any rate which is not "just and reasonable" is unlawful.

Petitioner asserts that, in a proceeding for a certificate of public convenience and necessity under § 7(e), when the rate is challenged by a party raising a substantial question as to its reasonableness, § 4(a) imposes a mandatory duty

on the Commission, as an essential prerequisite to the granting of permission to make the sale, to insure that the proposed rates are just and reasonable. Petitioner further contends that the Act does not state that the provisions of § 4(a) shall not apply to a sale to be authorized under § 7(e); that the prohibition of § 4(a) against sales that are not just and reasonable is all-inclusive and pervades the entire Act; and that § 4(a) applies to any and all sales, hence it applies to a sale as soon as it is commenced.

Petitioner claims the record does not support a finding, and the Commission did not find, that the increased rate proposed by Producers was "just and reasonable." This error, Petitioner asserts, requires that the order granting the certificates be set aside since the granting of the certificates as authorized results in Natural's obtaining its gas at a higher cost to its customers and, at the same time, results in increased cost to competing utilities by causing an unwarranted advance in the prevailing price in the area.

An examination of the evidence is necessary to determine whether the Commission abused its discretion in refusing to impose a price condition on the certificates issued to Natural and Producers.

The gas reserve in Jack and Wise Counties is the largest remaining undedicated gas reserve in the mid-continent area, and one of the largest discovered in the United States in recent years. This reserve was discovered by Producers in 1952 and is presently estimated to contain 2½ trillion cubic feet of gas. Natural has contracted with Producers for 750 billion cubic feet of this gas and Lone Star and Upham Gas Company have contracted for approximately the same amount, which leaves approximately 1 trillion cubic feet uncommitted to any purchaser. Petitioner has not sought nor does it seek to purchase any of this uncommitted gas, for it does not purchase any gas in Texas; its purchases and sales are wholly within the state of Oklahoma and no regulatory authority, as such, controls the price which Petitioner pays for gas. There is no reserve of gas well gas in Jack and Wise Counties, or in southern Oklahoma, comparable to that involved in this proceeding. The gas in these areas, exclusive of this reserve, is not gas well gas but casinghead gas, and gas well gas is much more valuable than casinghead gas.

In Jack and Wise Counties, Lone Star is able to enforce a policy of paying no more for gas well gas than it pays for casinghead gas, the price of which was increased to 12¢ per Mcf in January 1957. In southern Oklahoma, Lone Star and Petitioner have an agreement as to the price of gas and are able to enforce a policy of paying 10¢ per Mcf for both casinghead gas and gas well gas. This constitutes a two-cent differential. Petitioner has not increased its price because of the increase in price in the Jack and Wise Counties area. A comparison of Natural's 13.9¢ per Mcf price with the prices being paid for gas well gas by other gas purchasers in relevant areas shows that Natural's price is in line.

■ The foregoing facts support the findings and conclusions reached by the Commission in its order denying applications for rehearing, etc., issued January 31, 1957:

"* * * It is contended, first, that our opinion fails to protect the ultimate consumers of natural gas from excessive charges for gas. It is contended that the price for the producers' sales is excessive, being above the prevailing price in the area traversed by Natural's extension; that no sufficient reason has been given to justify authorizing the sale at such a price; and that the impact of the producers' prices in Oklahoma Natural's price structure will be most harmful. Further in this connection, Oklahoma Natural contends that there is nothing in the record on the basis of which the Commission could find that the rates of the producers are just and reasonable, a requirement said to be imposed by Section 7(e) of the Act,

and further evidenced, it is said, by certain Commission opinions and court decisions. Thus it is argued that we erred in concluding that the impact on Oklahoma Natural was not a matter of paramount concern in this case.

"These contentions likewise we find to be without merit. The element of price to the ultimate consumer is but one factor to be considered in determining upon the convenience and necessity involved in a given case. Here, as we pointed out in opinion No. 299 and accompanying order, other elements overbalance such increases as may ensue from the certification of the producers' sales to Natural at the prices authorized. Indeed, it may be mentioned that some doubt exists whether producer authorizations calling for lower producer prices would or could be consummated. Significantly, the City of Chicago, which represents consumers there, has not sought rehearing of opinion No. 299 and accompanying order. And although we have considered the public interests relating to Oklahoma Natural and the customers it serves, we are unable to conclude that those interests, either as a matter of law or on the basis of the particular facts in this case, outweigh the more pertinent interests represented by Natural and the consumers it serves.

"Nor do the prevailing prices in the area and such other related data as to market and producing conditions as are available to us justify the conclusion that the producers' prices are excessive or will have the violent impact which Oklahoma Natural envisages. * * * With respect to the contention that the producers' rates have not been shown to be 'just and reasonable,' a requirement said to be imposed by section 7(e) of the Act, it suffices to comment, without entering into any lengthy discussion of this question, that as we stated in opinion No. 288

and accompanying order, In the Matters of Cities Service Gas Company, et al., docket No. G–2569, et al., issued November 28, 1956, 'A proceeding of this nature can not and is not intended to take the place of a proceeding under Section 4 or 5 of the Act.' "

A dominant factor in this case is the need for more gas in the Chicago area. The Commission found that unsatisfied demands exist in Chicago and are increasing at a phenomenal rate, and the demand in the future will be over and above the present sales capacity of Natural's existing system of 510,000 Mcf per day. Natural's need has been rendered more acute by the fact that the Herscher underground storage field in Illinois, which was expected to develop a daily supply of 1,500,000 Mcf, can be relied on for only 430,000 Mcf per day.

The statute makes the issuance of a certificate dependent upon a finding of "public convenience and necessity," and it delegates to the Commission the power and duty to make that finding. The Commission, by its expert knowledge of and continuing contact with the natural gas industry, is qualified to make the determinations of fact and the evaluations of policy which the issuance of a certificate requires.

The granting or denial of a certificate of public convenience and necessity is a matter peculiarly within the discretion of the Commission. The Commission's action in imposing a price condition on the issuance of a certificate was upheld in Cities Service-Signal Oil supra; and in Sunray Mid-Continent Oil Co. v. Federal Power Commission, 10 Cir., 1956, 239 F.2d 97, 101, reversed on other grounds, 353 U.S. 944, 77 S.Ct. 792, 1 L.Ed.2d 794, in upholding the Commission's authority to refuse to impose conditions on the issuance of certificates, the court said:

"Just as the Commission has authority to impose conditions upon the issuance of a certificate so, too, it

has authority to refuse to impose conditions."

Under § 7(e) it is provided:

"The Commission shall have the power to attach to the issuance of the certificate [of public convenience and necessity] and to the exercise of the rights thereunder such reasonable terms and conditions as the public convenience and necessity may require."

█ It is obvious that the plain congressional meaning is to vest the Commission with the discretion to attach terms, including rate conditions. It is fitting that there should be this discretion and, in the absence of an abuse of that discretion, courts should not interfere. We find no such abuse here.

█ Petitioner contends that in a certificate proceeding under § 7(e), where the price being paid by a producer is above that then being paid by others in the specific area, the Commission must either impose a price condition or determine the justness and reasonableness of the price, as in a proceeding under §§ 4 and 5, 15 U.S.C.A. §§ 717c, 717d. In other words, it is contended that the Commission, in such a situation, has no discretion but must take one of the two courses. We think not. Section 4(a) states the substantive objective of the Act, that rates be reasonable; it does not specify the procedure by which this objective is to be attained. That procedure is prescribed by §§ 4(d), 4(e) and 5(a). The Commission cannot be required to convert every certificate proceeding into a rate proceeding. As the Commission said in In the Matter of Tamborello, FPC Docket Nos. G-3045, et al., 15 F.P.C. 1, 3 (1955):

"Such holding would not only be contrary to the plain language of the act but would also prevent us from exercising the judgment and discretion delegated to us by Congress."

Petitioner also relies on Cities Service Gas Co. supra, affirmed sub. nom. Signal Oil & Gas Co. v. Federal Power Commission, 3 Cir., 1956, 238 F.2d 771, certiorari denied 1957, 353 U.S. 923, 77 S. Ct. 681, 1 L.Ed.2d 720. It is contended that the Commission erred in not following that case and in granting the certificate to Producers without the price condition.

In Signal Oil supra, Cities Service Gas Company proposed to purchase the processed "residue" from Signal Oil in southern Oklahoma at a rate of 12¢ per Mcf. This petitioner and Lone Star were intervenors in that proceeding. In determining that the sale of Signal to Cities Service should be conditioned upon the price being reduced to 10¢ per Mcf, the Commission stated:

"In the face of admitted injury to many parties in this proceeding, we are convinced that a rate structure which has prevailed in this area for some time should not be disturbed without a showing more substantial than appears on this record that such a change is necessary and that the level to which the rates are proposed to be changed is itself just and reasonable."

Signal appealed. The Court of Appeals for the Third Circuit held that the Commission's finding that the public convenience and necessity required that the certificate be conditioned at the 10¢ rate was supported by substantial evidence. The court pointed out that Signal failed to establish that the proposed rate of 12¢ per Mcf was reasonable to the purchaser or that the existing rate of 10¢ per Mcf was unjust to the seller. Petitioner here contends that, no proof having been offered that the rate was just and reasonable, the Commission's decision should be set aside. We do not agree with this conclusion. The Commission stated that its decision in Cities Service-Signal was made solely on the basis of the facts presented in that case, and added:

"* * * clearly the basis for decision in this proceeding is not necessarily controlling in any future

proceedings involving the rates of Signal or any other independent producer."

In that case, Lone Star, Petitioner and Cities Service were purchasing the same type of gas, i. e., casinghead, under similar conditions and under contracts having substantially the same characteristics and identical price provisions. They were sharing the same sources of supply from the same area. Also, it was clear that the effect of paying 12¢ per Mcf would be to drive the price upward in southern Oklahoma, and that Lone Star and Petitioner would have to compete against any new higher price level. The Commission found that 10¢ per Mcf was the prevailing price in the area.

In its opinion in the present case, the Commission stated:

"As to the price for gas purchased by Natural from the producers, under the amendments to these parties' contracts contained in the record in the reopened proceedings, the price for the initial volumes of gas is 13.9 cents per Mcf on a 150 B.t.u. basis, and including the dehydration charge. However, as detailed hereinafter, with the increase in through-put anticipated, there would be very little difference between the cost to Natural of gas delivered at Fritch under its own proposal and under that of Lone Star. Accordingly, although the record does not afford a basis for determining what the precise 'just and reasonable' rate is for the gas sold to Natural under its contracts with the producers, in view of all the circumstances in this case we cannot conclude that the public convenience and necessity requires that this certificate issue only if the rate at which this gas is sold is less than the proposed price of 13.9 cents. The matter of the producers' rates is subject to our continuing supervision and control and if sufficient reason appears therefor, can be considered on the basis of a factual record developed in an appropriate proceeding under the Act.

"Nor do we consider that any condition should be imposed in the certificates issued to the producers, requiring the reduction of their proposed price to Natural. In our opinion No. 288, In the Matters of Cities Service Gas Company, docket Nos. G–2569, et. al., we made it clear that the particular circumstances presented in each case are of decisive importance in determining whether a condition like that imposed in the Signal case should be attached to the issuance of a certificate to a producer. These circumstances include the extent to which a convincing showing has been made that as a result of the price proposed, the prices for other sales in the area in question will be increased, keeping in mind such relevant factors as the kind and quantity of gas sold, the degree of competition present in the area, and the extent to which the producer contract in question resembles the other gas sales contracts in the area. But in this case, no convincing showing has been made that as a result of the price proposed under the contract between Natural and the producers, the results we envisaged in opinion No. 288 will come about. Nor are we satisfied that the competitive conditions in the Jack and Wise Counties area are such as to justify fixing upon 11 cents as the prevailing price."

We are unable to state that the facts developed at the hearings do not support the Commission's findings and conclusions.

Finally, insofar as this court is concerned, the question would seem to have been passed upon by this court in Florida Economic Advisory Council v. Federal Power Commission, 102 U.S.App. D.C. 152, 251 F.2d 643, 646, certiorari denied 78 S.Ct. 996, where, on the point involved, we used language particularly appropriate here:

"*Suppliers' Rates.* Petitioner claims the Commission should have held a rate hearing to determine the

lawfulness of the rates to be charged by the gas suppliers. But this inquiry may be resolved in a rate proceeding rather than in a proceeding for a certificate of public convenience and necessity, and the Commission did not abuse its discretion in declining to consider the matter in the instant proceeding. The rates are subject to the Commission's continuing jurisdiction, and, whenever sufficient reason appears, they may be taken up. Petitioner cites City of Pittsburgh v. F.P.C. [99 U.S.App.D.C. 113, 237 F.2d 741] as requiring the Commission to consider these rates now. That case is not applicable because future correction of the alleged defects was not possible under the circumstances presented in that case. Here, the rates in question may always be corrected, if need be."

We have considered this case as though Petitioner has standing—a claim seriously controverted by respondent and intervenors. The views above expressed make it unnecessary for us to pass on this point.

The petition for review is

Dismissed.

BAZELON, Circuit Judge (dissenting).

The order here under review was entered in proceedings upon the following applications:

(1) By Natural Gas Pipeline Company of America (Natural) for authority to build and operate an extension of its line from its present southern terminus at Fritch, Texas, through southwestern Oklahoma, to a point in Wise County, Texas, for the purpose of taking gas from certain independent producers.[1] Natural's proposal was based on two factors: (a) the ever-expanding demand for gas in its Chicago market, far in excess of its capacity to deliver,[2] and (b) the undependability of that part of its present gas supply, some 80,000 m.c.f.

per day, received through spot purchases rather than long-term contracts. The proposed extention, referred to in the record as "the Oklahoma Extension," was to have a capacity of 240,000 m.c.f. per day and was planned to pass through highly productive Oklahoma gas fields, from which, eventually, large volumes of gas were to be purchased. The immediate proposal, however, was to take only about 80,000 m.c.f. per day under long-term contracts with three independent producers in Jack and Wise Counties, Texas. This gas would replace the undependable spot purchase gas.

(2) By the three producers for authority to sell the 80,000 m.c.f. to Natural.

(3) By Lone Star Gas Company (Lone Star), competing for authority to extend its own facilities to Natural's southern terminus for the purpose of supplying Natural's additional gas requirements. The point of Lone Star's proposal was that, by building an extension of lesser capacity than Natural's and by buying gas at a lower price than Natural, it could deliver 80,000 to 100,000 m.c.f. of gas per day to the Fritch terminus of Natural's pipeline at a cost to Natural of 20.6 cents per m.c.f. as compared with a cost of about 35 cents per m.c.f. under Natural's own proposal.

Petitioner Oklahoma Natural Gas Company (Oklahoma Natural), together with Lone Star, certain other companies purchasing gas in the Texas and Oklahoma fields to be tapped by the Oklahoma Extension, and the City of Chicago, intervened in opposition to the applications of Natural and the independent producers. Their opposition was based mainly on the allegedly excessive initial contract price called for under Natural's contracts with the producers. The City of Chicago argued that this price would ultimately be reflected in higher consumer rates in Chicago. The other intervenors argued that the price was substantially higher

---

1. An "independent" producer is one without corporate affiliation with an interstate gas pipeline company.

2. See Midwestern Gas Transmission Co. v. Federal Power Commission, 103 U.S. App.D.C. ——, 258 F.2d 660.

than the prevailing field prices in the areas to be tapped by the extension and would result in raising the prices they have to pay for gas they purchase in those areas.

The City of Chicago and Oklahoma Natural intervened in support of Lone Star's application.

## I

On February 1, 1956, the presiding examiner issued an initial decision denying Lone Star's application and granting those of Natural and the producers, but only on condition that the contract price be reduced to the prevailing field price in Jack and Wise Counties, Texas.

While the Commission was considering the exceptions of the various parties to the examiner's initial decision, Natural and the producers amended their contracts by reducing the initial price by one cent per m.c.f., but accelerating the escalation provisions, "thus maintaining the same average price per Mcf over the life of the contract as was initially provided in the contract." The Commission then reopened the record to reflect these amendments and directed that evidence also be received as to Natural's proposal to carry up to 200,000 m.c.f. per day in the Oklahoma Extension. In the course of the reopened hearings, Lone Star made an offer to Natural to supply it with gas on an increasing scale, up to 200,000 m.c.f. per day by July 1, 1968. Natural accepted this offer, but only on condition that its own application be granted.

On December 4, 1956, the Commission issued its Opinion No. 299 and the accompanying order here under review. The Commission's disposition of the case differed from the initial decision in the following respects:

(1) It granted not only the applications of Natural and the producers, but also that of Lone Star, limiting the latter, however, to a delivery of a maximum daily load of 100,000 m.c.f. and an average daily load of 80,000 m.c.f., and re-quiring the delivery to be made at a midway point on the Oklahoma Extension rather than at Fritch, Texas.

(2) It eliminated the condition imposed by the examiner that the contract prices be reduced to the prevailing field price.

(3) Since Natural's main line from Fritch to Chicago was operating at substantially full capacity and could only accommodate the 80,000 m.c.f. purchased from the producers as a replacement for the spot purchase gas, the Commission required Natural, as a condition to the grant, to apply within ninety days for authority to expand its main line capacity by 100,000 m.c.f.

The various applicants accepted the grants as conditioned by the Commission and Natural made a timely application for authority to expand its main line capacity as required by the Commission. The authority it sought, however, was for an expansion by 185,000 m.c.f. per day, rather than the 100,000 m.c.f. the Commission specified. The extra 85,000 m.c.f. per day would presumably consist, at least in part, of gas purchased in southern Oklahoma along the route of the Oklahoma Extension.

The principal arguments here, as also before the Commission, relate to the price of the gas Natural is to receive from the producers. Some discussion of that price is necessary before reaching the specific issues in the case.

## II

The customary and prevailing practice in the Texas and Oklahoma gas fields here involved is for the seller to gather the gas, extract the liquids from it and then deliver it to the purchaser. Moreover, although contracts provide for downward price adjustments for B.T.U.[3] content of less than 1000, there is customarily no provision for upward adjustments for B.T.U. content over 1000. Natural and the producers had originally negotiated for a price of fifteen cents per m.c.f. for gathered gas to be delivered

3. British thermal units.

at the tailgates of the producers' gasoline extraction plants. Before the contracts were made, however, the Supreme Court held in Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, that the Commission had jurisdiction over producers selling gas at wholesale in interstate commerce. In what the examiner found to be an effort to escape Commission jurisdiction, the producers required Natural to take the gas at the well-head and do its own gathering, the price being reduced to fourteen cents per m.c.f. to compensate. In addition, Natural was required to pay one-fourth cent per m.c.f. as a dehydration charge and, for B.T.U. content of over 1000, was required to pay an adjusted higher price.[4] Concluding that the price should not exceed the prevailing field price, the examiner ordered not only a lowering of the base price but also an elimination of upward price adjustment.

The price provided by the post-hearing amendment of the contracts was found by the Commission to be 13.9 cents per m.c.f. for ungathered gas on a 1050 B. T.U. basis,[5] including the dehydration charge. This price is arrived at by taking the base price as 13 cents (a one cent reduction from the original contracts) and adding to it ¼ cent for dehydration and 0.65 cents for the 50 B.T.U. above 1000. The 1050 B.T.U. figure employed by the Commission was "assumed" in the testimony of a Natural witness. One of the producer witnesses predicted that the gas would have a B.T.U. content of 1073 and a Lone Star witness estimated it at 1146. At those

higher B.T.U. figures, the price of ungathered gas would be 14.2 cents or 15.15 cents per m.c.f., rather than 13.9 cents as found by the Commission on the basis of the assumed 1050 B.T.U. figure. The presiding examiner, since he eliminated the B.T.U. adjustment provision, had no occasion to make a finding as to what the B.T.U. content of the gas would be. The Commission, although it restored the provision, neglected to make its own finding. Its adoption of Natural's mere *assumption* as to what the B.T.U. figure would be does not, in the face of contrary evidence in the record, amount to a *finding* as to the figure. As the record stands, therefore, the price of ungathered gas under the amended contracts is no less than 13.9 cents per m.c.f. and perhaps as high as 15.15 cents per m.c.f.

Nor did the Commission make any finding as to the cost of gathering the gas. A Natural witness estimated that cost at 1.4 cents per m.c.f. and a Lone Star witness at 2.4 cents. Thus the cost to Natural of *gathered* gas would range between 15.3 cents and 17.55 cents per m.c.f.[6] But no finding was made as to what the actual cost would be.

Since the issues in this case relate to a comparison of this 15.3 cent—17.55 cent price with those prevailing in the gas fields which Natural proposes to tap, it is necessary to ascertain what the record discloses as to those prices.

Two gas fields are in question: the Texas area to be initially tapped by the Oklahoma Extension and the southern Oklahoma area through which the ex-

4. The formula provided in the contracts is:

$$\text{Adjusted Price} = \frac{\text{B.T.U. content}}{1000} \times \text{Base Price}$$

5. The Commission's opinion as printed in the joint appendix gives the B.T.U. figure as "150" (J.A. 528), but from the record generally and from the reported opinion, this would seem to be a typographical error. 16 F.P.C. at 91.

6. I. e., between 15.3 cents and 16.3 cents on a 1050 B.T.U. basis; between 15.6 cents and 16.6 cents on a 1073 B.T.U. basis; and between 16.55 cents and 17.55 cents on a 1146 B.T.U. basis.

tension will pass and which Natural proposes to tap next. As to the Texas price, the initial decision recites:

> "It is conceded that the highest price currently being paid for natural gas under contracts in the Jack-Wise Counties area * * * is 11¢ per Mcf."

As to the southern Oklahoma area, the presiding examiner noted in the initial decision (1) that the Commission had recently found in Cities Service Gas Co., et al., 12 P.U.R.3d 3 (1955), affirmed sub nom. Signal Oil & Gas Co. v. Federal Power Commission, 3 Cir., 1956, 238 F.2d 771, certiorari denied 1957, 353 U.S. 923, 77 S.Ct. 681, 1 L.Ed.2d 720, "that no more than 10¢ per Mcf was being paid for any gas purchased * * *," and (2) that this finding was also supported by the present record.

The Commission does not overrule or even challenge the examiner's findings. It merely says:

> "In arriving at the determinations which follow, we have considered the entire record in these proceedings, including the presiding examiner's comprehensive decision on the initial hearing. However, because of various changes to the parties' proposals

in the reopened hearing, many of the presiding examiner's determinations are no longer applicable. It would unduly burden this order to attempt to specify those findings which are still material and which are supported by substantial evidence and those which are not. Accordingly, we shall set forth our own determinations in lieu of modifying and adopting the examiner's decision, referring however where appropriate to particular findings of

the examiner which still subsist." The only "determination" the Commission made with respect to the prevailing price in the Texas field was the following:

> "Nor are we satisfied that the competitive conditions in the Jack and Wise Counties area are such as to justify fixing upon 11 cents as the prevailing price."

Since 11 cents was *conceded* to be the highest price paid[7] and since there is uncontroverted evidence in the record that there is "keen" competition for gas purchases in the area,[8] the Commission could not, without pointing to contrary evidence in the record,[9] find otherwise.

---

7. In January 1957, after the date of Opinion No. 299, the price paid by Lone Star in the Texas field escalated to 12 cents per m. c. f. But the Commission, in its opinion and order, dealt with the then-existing price of 11 cents per m. c. f. Nor was the 1 cent escalation even referred to in the subsequent order denying rehearing. For comparative purposes, therefore, it seems proper that we also use the 11 cent price. It is, perhaps, worth noting that the producers' contracts with Natural also provide for future price escalations. But see § 154.94(a), (c) of the Commission's Regulations, 18 C.F.R. § 154.94(a), (c).

8. Despite the uncontradicted evidence of competition for gas in the Texas field (J.A. 30–32), the majority asserts that Lone Star has been able to "enforce" a low-price policy. No such finding was made either by the presiding examiner or by the Commission. The assertion is apparently based on a similar assertion made by the producers in their brief

in this court, but the brief contains no record references. If support for the assertion lurks somewhere in this 30,000 page record, I have not found it and none of the parties has called it to our attention.

9. The Commission says that, to be the "prevailing" price, the 11 cent price must apply to the same kind and quantity of gas as the contract price here in question. The gas here involved is gas-well gas, rather than casing-head gas (a byproduct of petroleum refining), and these contracts call for large volumes of gas. The examiner found that, though much of the gas sold in Jack and Wise Counties is casing-head gas, considerable volumes of gas-well gas are also sold at the 11 cent figure. He also found that, though many of the purchase contracts are for small volumes of gas, some are for very substantial volumes running up to 12,000 m. c. f. per day. There is evidence, moreover, that Lone Star, in its purchases, pays the 11 cent rate for

I do not, therefore, read the Commission's expression of dissatisfaction as a determination that the prevailing field price in Jack and Wise Counties was not 11 cents per m.c.f.

With respect to the Oklahoma field, the Commission indirectly suggests that the examiner's finding in the instant case and its own finding in the Cities Service case, supra, that the prevailing price is no higher than 10 cents per m.c.f. are erroneous. It finds that gas is being sold in that field at a higher price than 10 cents per m.c.f. This finding is based upon a showing by Natural that one contract was made on April 19, 1955, for a sale of gas in the Oklahoma field at a higher price. The contract in question was not offered in evidence. The examiner, therefore, correctly refused to consider the contract when it was submitted after the hearing as an attachment to the brief of one of the producers. He also rejected as without record support the argument made by Oklahoma Natural that the contract was a "one-shot" purchase by an electric utility which could have had no effect on the field price because it would not be repeated. He found:

"The record shows nothing as to the nature of the buyer or its operations, present or future. With such scanty information, no useful purpose would be served by attempting to speculate as to the possible effect of any such contract upon the general price level in southern Oklahoma."

The Commission did not overrule the examiner and order the contract made part of the record. Without doing so, it could not base a finding on the contract. Moreover, although that contract had been made some seven months before the Commission's decision in Cities Service, supra, the Commission there found the prevailing field price to be ten cents. And if it be said that the Commission may not have known of the contract when it decided Cities Service, it certainly knew of it on April 4, 1958, when it reaffirmed in Pan American Petroleum Corp., et al., Opinion No. 310, mimeographed opinion at pp. 13–14, its Cities Service finding that the prevailing field price in the southern Oklahoma field was 10 cents.[10]

To sum up, these are the facts about price:

1. The prevailing price of gas in the Texas field is 11 cents per m.c.f.

2. The prevailing price of gas in the southern Oklahoma field is 10 cents per m.c.f.

3. The price at which the producers contracted to sell gas to Natural, translated to the same terms at which the foregoing 11 cent and 10 cent field prices apply, is between 15.3 and 17.55 cents per m.c.f.

### III

An additional preliminary question to be considered before we address ourselves to Oklahoma Natural's attack on the Commission's order is the contention of the intervenors that Oklahoma Natural is not a "party aggrieved" within the meaning of § 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r(b), and therefore has no standing to maintain this petition.[11]

large and small volumes alike. None of these findings are contradicted by the Commission.

10. The majority asserts that the 10 cent price in Oklahoma is fixed by "an agreement" between Lone Star and Oklahoma Natural. So far as I have been able to find, this assertion, like the majority's assertion with respect to the Texas price (supra note 8), is based on an altogether unsupported allegation in the producers' brief.

11. My brethren, though finding it unnecessary to pass on this question, note that Oklahoma Natural's claim to standing has been "seriously controverted by respondent and intervenors." At least with regard to respondent, this observation would seem to be in error. The statement of questions presented in respondent's brief makes no reference to the standing question.

There is abundant evidence in the record to show, as Oklahoma Natural argues and as the presiding examiner found, that Natural's purchases under its contracts with the producers would start an upward price spiral in the southern Oklahoma field where Oklahoma Natural buys its gas, to the latter's direct detriment and to the ultimate detriment of the consumers it serves. There is no evidence to show the contrary.[12] Yet the Commission concludes that "the prospect of price changes to Oklahoma Natural in consequence of the price proposed under Natural's producer contracts is too remote to be a matter of paramount concern in this case."

We need not consider the validity of the Commission's conclusion in this regard, because, apart from whether or not an Oklahoma price spiral will result from Natural's Texas purchases, it is beyond question that the certification of Natural's project will aggrieve Oklahoma Natural by removing available gas from the market. The Commission found that the Texas purchases are "only a beginning phase in Natural's program to secure needed supplies of gas" and that "Natural intends to contract for additional volumes of gas" in the "highly productive gas areas in southern Oklahoma" traversed by its extension. Indeed, before the initial decision imposed the price condition, Natural had already contracted for gas with one large producer in southern Oklahoma at substantially above the prevailing field price[13] and was in the advanced stages of negotiation with others. It is obvious that with Commission certification of the Oklahoma Extension and the producer sales at a price between 15.3 cents and 17.55 cents per m.c.f. and with Natural ready and willing to pay a similar advanced price to Oklahoma producers along the route of the extension, the latter will keep their gas available for Natural rather that make long-term contracts with Oklahoma Natural at the much lower prevailing field price. It is no answer to say that Oklahoma Natural will not be aggrieved until the Commission certifies sales by Oklahoma producers to Natural. The present withholding from the market of gas which Oklahoma could otherwise buy constitutes present aggrievement and it is "direct and immediate injury" flowing from the present certification. City of Pittsburgh v. Federal Power Commission, 1956, 99 U.S. App.D.C. 113, 119, 237 F.2d 741, 747. I conclude, therefore, that Oklahoma Natural has standing under the Natural Gas Act to maintain this petition and I reach now the question whether the Commission's order may stand.

12. Numerous expert witnesses testified on behalf of the various parties. Many of them stated their opinions that the price all along the route of the Oklahoma Extension would rise sharply as a result of Natural's purchases in Texas. I have found no testimony to the contrary and the Commission refers to none in its opinion. The Commission points to only two things in support of its conclusion: *First*, that the one contract made in Oklahoma on April 19, 1955, at a rate higher than 10 cent per m. c. f. (see supra, p. 22) started no price spiral; and *second*, that Lone Star pays less for gas in Oklahoma than in Texas. As to the first matter, as I have shown, Oklahoma Natural wished to argue before the examiner that it was the type of contract that has no effect on the market, but was prevented from doing so because the examiner rejected both the contract and the refutation. The Commission cannot now rely on the contract without giving Oklahoma Natural a chance to refute its evidentiary effect. As to the second matter relied on by the Commission, the record shows a one cent price differential between Lone Star's Texas and Oklahoma purchases. Because an 11 cent Texas price does not push up a 10 cent Oklahoma price, it does not follow that a 15.3 cent or 17.55 cent Texas price will have no effect in Oklahoma. Moreover, if the two fields are so economically unrelated today that a price differential can be maintained, it does not follow that they will remain unrelated after they are joined by a pipeline tapping the reserves of both fields.

13. After the imposition of the rate condition, that contract appears to have been terminated.

## IV

The principal ground upon which we are urged to set aside the certification of the Oklahoma Extension project is that the Commission failed to make any determination as to the justness and reasonableness of the price Natural is to pay the independent producers for the gas to be carried in the extension. The Commission's position was stated in its opinion as follows:

"* * * Accordingly, although the record does not afford a basis for determining what the precise 'just and reasonable' rate is for the gas sold to Natural under its contracts with the producers, in view of all the circumstances in this case we cannot conclude that the public convenience and necessity requires that this certificate issue only if the rate at which this gas is sold is less than the proposed price. * * * The matter of the producers' rates is subject to our continuing supervision and control and if sufficient reason appears therefor, can be considered on the basis of a factual record developed in an appropriate proceeding under the Act."

In its order denying rehearing the Commission further stated:

"* * * With respect to the contention that the producers' rates have not been shown to be 'just and reasonable,' a requirement said to be imposed by Section 7(e) of the Act, it suffices to comment, without entering into any lengthy discussion of this question, that as we stated in [Cities Service] * * *, 'A proceeding of this nature can not and is not intended to take the place of a proceeding under Section 4 or 5 of the Act.'"

In its brief filed here, the Commission suggests [14] that its functions with regard to rates are to be performed only in proceedings under §§ 4 or 5 of the Natural Gas Act. It argues that "there is nothing in the rate or certificate provisions of the Natural Gas Act that makes it the responsibility of the Federal Power Commission to attempt to exercise" the judgment of what price a pipeline should pay in the first instance for gas it takes from a field in which it has not previously purchased gas. "That responsibility," says the Commission, "is upon the applicants." Further, the Commission argues, its grant of the certificates here does not leave the consumer interest in price unprotected because the order provides:

"The grant of the certificates herein shall not be construed as a waiver of the requirements of Section 4 of the Natural Gas Act, or of Section 154 of the Commission's Rules and Regulations thereunder requiring the filing of rate schedules for the service herein authorized, and is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against the applicants. Further, the action taken in this proceeding shall not foreclose nor prejudice any future proceedings or objection relating to the operation of any price or related provision in the gas purchase contracts herein involved."

The assessment of these arguments requires an examination of the rate regulation provisions of the Natural Gas Act.

Such an examination shows first that the rate filing requirement of § 4 of the Act does *not* protect the consumers' price interests. Under § 4(c), every natural gas company must file with the Commission schedules of its rates and charges. Section 4(d) provides that "no change shall be made by any natural-gas company in any such rate" without filing with the Commission "new schedules." By § 4(e) when "any *such* new schedule is filed," the Commission may hold a hearing concerning the lawfulness of the rate and, pending such hearing,

---

14. Natural's brief makes an explicit point of this argument.

may suspend the operation of the new rate for as long as five months and, if the suspension expires and the increased rate becomes effective before the completion of the hearing, may require the company to furnish a bond to refund any amounts ultimately found unjustified. The protection afforded the consumer by the suspension and refund provisions of § 4(e), it is noted, applies only to situations where the company files *a new rate schedule changing an existing rate.* It does *not* apply to the filing of an *initial rate* such as is involved here.

To be sure, an improper initial rate may be attacked under § 5(a) of the Act which provides:

"Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulations, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order  *  *  * ."

But § 5(a) proceedings are notoriously long and complicated and no provision is made for even temporary suspension of rates or for refund of amounts received under such portions of rates as may ultimately be found to be unlawful. As the Commission said in the Cities Service case, supra:

"A proceeding under § 5(a)  *  * is certain to entail a long delay in terms of final decision, and there is no way of undoing the damage done to the public in the interim period." 12 P.U.R.3d at 15.

Thus, unless the Commission has the power and duty to protect the public interest in just and reasonable rates *in the § 7(e) certification proceeding,* that interest must remain essentially unprotected. And, if that interest remains unprotected, there would seem to be very little purpose in any regulation of the natural gas industry.[15] The Supreme Court said in the Phillips case, 347 U.S. at page 685, 74 S.Ct. at page 800: "Protection of consumers against exploitation at the hands of natural-gas companies was the primary aim of the Natural Gas Act."

Section 7(e) of the Act provides:

"  *  *  * a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed *and to conform to the provisions of the Act* and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be *required by the present or future public convenience and necessity;* otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder *such reasonable terms and conditions as the public*

---

15. "Pricing is the most important function of regulation. Indeed all other regulatory processes lead to this one, are subordinate to it, and may be judged according to the degree to which they as- sist in making it sound and effective." Connole, General Considerations: A Nation's Natural-Gas Pains, 44 Geo.L.J. 555, 558 (1956).

*convenience and necessity may require.* [Emphasis supplied.]"

One of the "provisions of the Act," to which the applicant must be found able and willing to perform, is that all rates be "just and reasonable." § 4(a). Moreover, the Commission itself has said that the justness and reasonableness of the rate is a "vital element" in a showing "that the service proposed is or will be required by the present or future public convenience and necessity." Cities Service case, 12 P.U.R.3d at 14. And the intent of Congress in enacting § 7(e) was to give "the Commission an opportunity to scrutinize * * * the characteristics of the rate structure in connection with the proposed construction or extension at a time when such vital matters can readily be modified as the public interest may demand." [16] The Commission could not, therefore, certify Natural's extension and the producers' sales as being required by the public convenience and necessity without some determination *in the certification proceeding* that the contract rate was just and reasonable.

That the rate feature of a proposed natural gas service is a vital element in the question whether the service should be certified as required by the public convenience and necessity is a proposition often recognized by the Commission. In its 1949 Annual Report to Congress, for example, it said at p. 114:

"The rate proposals in connection with the new pipe lines and services must be carefully analyzed to ascertain whether the statutory requirements of reasonableness and nondiscrimination are met."

In its 1951 Report, it said at p. 109:

"To assure that reasonable and nondiscriminatory rates are established for all new services authorized in certificate proceedings and to determine the effect of any new construction on presently effective rates, each new certificate application filed with the Commission must be carefully analyzed from a rate viewpoint."

And at p. 127 of its 1954 Report it stated:

"The Commission, in issuing certificates for new pipelines and extensions of existing pipelines into new market areas, must review the proposed rates to ascertain (1) whether the project is economically feasible, and (2) in those cases where the rates are subject to the jurisdiction of the Commission, whether statutory requirements of reasonableness and nondiscrimination are met." [17]

16. H.R.Rep. No. 1290, 77th Cong., 1st Sess., 2–3 (1941); cited by the court in Signal Oil, 238 F.2d at page 774. See also, to the same effect, S.Rep. No. 948, 77th Cong., 2d Sess., 2 (1942).

The presently significant change in the Natural Gas Act effected by the Act of February 7, 1942, c. 49, 56 Stat. 83, which amended § 7 of the Act of June 21, 1938, c. 556; § 7, 52 Stat. 824, by striking out subsection (c) thereof and substituting the present subsections (c) through (g), was to grant the Commission the power to impose conditions. Even under the original subsection (c), however, the Commission's power and duty to consider rates were beyond question. That subsection provided:

"In passing on applications for certificates of convenience and necessity, the Commission shall give due consideration to the applicant's ability to render and maintain adequate service at rates lower than those prevailing in the territory to be served, it being the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."

17. We may note from the record in another certification case which we have recently reviewed, Midwestern Gas Transmission Co. v. Federal Power Commission, supra note 2, that the Commission, overruling the presiding examiner's requirement that complete underlying rate data be presented in connection with a preliminary proceeding to determine market requirements, said:

"This information must eventually be

It was not until the Supreme Court's Phillips decision on June 7, 1954, that independent producers' rates to pipelines were considered to be "subject to the jurisdiction of the Commission." The immediate effect of Phillips was an immense increase in the Commission's workload. In the year following Phillips the Commission received five times as many certificate applications as in the twelve years preceding that decision.[18] Moreover, independent producer certificate applications presented problems substantially different from those theretofore dealt with by the Commission in certifying pipelines.[19] The Commission has therefore adopted a policy of postponing the determination of the justness and reasonableness of producers' rates to a subsequent rate proceeding *if, on the basis of the evidence presented in the certification proceeding, it appears proper to do so.* See Re Tamborello, 11 P. U.R.3d 413, 417 (1955). But for the purpose of deciding whether the rate determination may safely be postponed, the Commission requires a presentation in the certification proceeding of "the basic facts as to the rates to be charged." Ibid. "If on the basis of such evidence it appears to the commission that examination into the justness and reasonableness of a specific rate of an independent producer in a certificate proceeding is required, there is ample authority in the statute for appropriate inquiry td be made in that proceeding." Ibid.

What it takes to persuade the Commission that it should not certify without a rate determination is indicated by its decision in Cities Service, supra, decided the same day as Tamborello. Cities Service involved an application for a certificate to sell gas at 12 cents per m.c.f. from the same southern Oklahoma area involved here, where the prevailing field price is 10 cents per m.c.f. The Commission said:

"In the face of admitted injury to many parties in this proceeding, we are convinced that a rate structure which has prevailed in this area for some time should not be disturbed without a showing more substantial than appears on this record that such a change is necessary and that the level to which the rates are proposed to be changed is itself just and reasonable. We find that the certificate applicants herein have failed to demonstrate that a rate level of 12 cents per Mcf is necessary in the public interest or that the public convenience and necessity which requires the issuance of this certificate dictates a finding that a rate of 12 cents is necessary to ensure the economic feasibility of the project." [12 P.U.R.3d at 16.]

While parity with field price may not alone be sufficient for a determination of justness and reasonableness of a rate,[20] substantial disparity with field price is a sufficiently reliable index of unjustness and unreasonableness of a

---

presented in connection with the final and overall determination of what the public convenience and necessity requires." 103 U.S.App.D.C. ——, 258 F.2d 660.

18. Annual Report of the Federal Power Commission for 1955, p. 87.

19. See Re Tamborello, 11 P.U.R.3d 413, 417 (1955). A basic question is the extent to which one should apply to producers' rates the return-on-rate-base method of rate-fixing which has been developed in the regulation of enterprises involving large investment compared with revenue. See Connole, supra note 15, at 560-61. For other problems, see the Commission's Opinion No. 310,

issued April 4, 1958, in Pan American Petroleum Corp., et al.

20. City of Detroit v. Federal Power Commission, 1955, 97 U.S.App.D.C. 260, 230 F.2d 810, certiorari denied Panhandle Eastern Pipe Line Co. v. City of Detroit, 1956, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48. See, however, Pan American Petroleum Corp., et al., supra note 19, where the Commission, on a record containing very little showing of cost of production, held just and reasonable, in a § 4 rate proceeding, a rate 25 per cent *below* the prevailing field price. But cf. Union Oil Co. of California, et al., 16 F.P.C. 100 (1956); and Bel Oil Corp. v. Federal Power Commission, 5 Cir., 255 F.2d 548.

rate to preclude certification without a rate determination. Indeed, in its administration of the rate suspension provision of § 4(e) of the Act, the Commission's "principal guide * * * in determining whether or not to suspend has of necessity been a comparison of the proposed price with field prices in the area." Pan American Petroleum Corp., et al., Opinion No. 310, issued April 4, 1958, mimeographed opinion, p. 14. If 2 cents over the field rate was an index of unjustness and unreasonableness in the Cities Service case, it is difficult to see how 4.3 cents to 6.55 cents over the 11 cent field price in Jack and Wise Counties can be disregarded in the instant case.

The Commission was confronted here with a project involving purchases of gas at from 39 per cent to 60 per cent above the prevailing field price. Having failed, in the face of strong and serious contentions that the proposed rate was unlawful under § 4(a) of the Act,[21] to make any determination of the justness and reasonableness of the rate, the Commission now argues that it is not required to do so in a certification proceeding. As I have shown above, in its Annual Reports prior to the Phillips decision, the Commission recognized a *requirement* that it examine rate proposals in certification proceedings.[22] The difficulties entailed in examining the rate features of the swarm of producer applications brought on by Phillips apparently induced the Commission to place a new interpretation on the Natural Gas Act. Whereas it had recognized in its six previous Annual Reports that, under the Act, it "must review" the proposed rates involved in applications for certificates

for new services, in its first post-Phillips Annual Report the Commission watered the statement down to say merely that it "has followed the practice of giving consideration to the proposed rates. * * *." Annual Report (1955) 135. And the next year, the Commission further watered down its statement to say that it "has *generally* followed the practice of giving consideration to the proposed rates * * *."[23]

The magnitude of the administrative task generated by Phillips may justify a Commission request for a greatly enlarged staff and appropriation. It may even, in the view of some, call for new legislation. It does not, however, give the Commission any warrant to change the statute.[24] Unless Congress changes the law, as the Commission recognized in Cities Service, "there is no basis upon which to distinguish the commission's power with reference to issuance of a certificate to an 'independent producer,' as here, and the exercise of such power with reference to an 'interstate pipeline company' * * *. The same act applies to both." 12 P.U.R.3d at 11.

Therefore, however difficult the administrative problem may be, the Commission *must* review and analyze the producers' rate as a vital element of the determination of whether the proposed extension project is required by the public convenience and necessity. And if, on the basis of its analysis, there appears a substantial question as to the lawfulness of the proposed rate, it may not certify the project as required by the public convenience and necessity unless it resolves that question. It is, of course, within the Commission's discretion to postpone for a rate proceeding

21. Cf. Florida Economic Advisory Council v. Federal Power Commission, 1957, 102 U.S.App.D.C. 152, 251 F.2d 643, in which it was the Commission's position that it is not required to consider justness and reasonableness of suppliers' rates "in the absence of any claim that the rates * * * are either unreasonably high or in any other respect unlawful * * *." No. 13833, Respondent's brief, p. 24.

22. Supra, 103 U.S.App.D.C. ——, 257 F.2d 650; see also Annual Report (1950) 115–16; id. (1952), 110; id. (1953), 112.

23. Annual Report (1956) 88; see also id. (1957) 89.

24. See Mississippi River Fuel Corp. v. Federal Power Commission, 3 Cir., 202 F.2d 899, 902–903, certiorari dismissed 1953, 345 U.S. 988, 73 S.Ct. 1138, 97 L. Ed. 1397.

the complicated task of determining the justness and reasonableness of the proposed rate, by conditioning its certificate upon the filing of a lower rate. That course was followed in Cities Service and, with respect to rates other than producer rates, in many other cases.[25] And it is the course that the Commission has said " it is necessary" to follow when a proper rate cannot be arrived at by agreement in the certification proceeding. Annual Report (1952) 110; Re Tamborello, 11 P.U.R.3d at 416. The imposition of a rate condition would protect not only the public, but also the proponents of the rate. The public would be protected against the nonrefundable damage inherent in a rate ultimately held excessive in a § 5 proceeding. If the rate imposed by the condition is thought to be too low, the proponents can protect themselves by contracting for a higher rate[26] and utilizing the relatively speedy corrective machinery of § 4 of the Act.

The alternative to imposing a rate condition is to take in the certification proceeding whatever evidence may be required to support a finding that the proposed rate is just and reasonable. Whether the rate aspect of a certification proceeding need be as searching as a hearing under § 5 may depend upon the circumstances of the particular case and need not be decided now.

I would hold only that, when substantial question exists as to the justness and reasonableness of the rates involved in a certificate application, the Commission, if it does not impose a rate condition and if it does not upon the evidence satisfy itself that the proposed rates are just and reasonable, cannot certify the project as being required by the public convenience and necessity.

V

I do not consider that my view is foreclosed by Florida Economic Advisory Council v. Federal Power Commission, 1957, 102 U.S.App.D.C. 152, 155, 251 F.2d 643, 646, certiorari denied 78 S.Ct. 996, in which the majority[27] said:

"Petitioner claims the Commission should have held a rate hearing to determine the lawfulness of the rates to be charged by the gas suppliers. But this inquiry may be resolved in a rate proceeding rather than in a proceeding for a certificate of public convenience and necessity, and the Commission did not abuse its discretion in declining to consider the matter in the instant proceeding. [Citing Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 83 U.S.App.D.C. 297, 169 F.2d 881, certiorari denied 1948, 335 U.S. 854, 69 S.Ct. 81, 94 L.Ed. 402.]"

It is not clear whether the court purported to hold (1) merely that the Commission was not required to conduct in a certification proceeding a rate hearing of the type it conducts under § 5 of the Act; or (2) that the Commission is never required to make any determination of the justness and reasonableness of suppliers' rates in a certification proceeding, even when the legality of the proposed rates is substantially in question, and even if the question can be resolved without a rate hearing.

If the holding was the first of the foregoing alternatives, the Florida decision is not inconsistent with the position I would take here, for I have not suggested that the Commission's determination of justness and reasonableness of rates need depend upon a full-scale rate hearing.

If the second alternative is the proper interpretation of the court's language, I think it need not be followed, because it is dictum, and should not be followed, because it is wrong. It is dictum because the case before the court was one

25. See, for example, Annual Report (1953) 112; id. (1954) 128.

26. Cf. Memphis Light, Gas & Water Division v. Federal Power Commission, 1957, 102 U.S.App.D.C. 77, 250 F.2d 402, certiorari granted 1958, 355 U.S. 938, 78 S.Ct. 430, 2 L.Ed.2d 420.

27. I dissented in that case on procedural issues, without reaching the rate questions considered by the majority.

in which the proposed rates were not claimed to be "either unreasonably high or in any other respect unlawful." [28] It is wrong in that it completely divorces justness and reasonableness of rates from the requirements of public convenience and necessity and apparently permits the Commission to certify a project without even *considering* the rate element.

The Panhandle Eastern case, upon which the majority relied in Florida Economic Advisory Council, gives no support for the proposition that the Commission may certify a project as required by the public convenience and necessity without regard to the validity of the rate proposals inherent in it. In Panhandle Eastern the Commission certified a pipeline project on two conditions: that the company obtain S.E.C. approval of its proposed plan of financing and that the company, before going into operation, file a schedule of "adequate and reasonable rates and charges consistent with the public interest." We upheld the certificate, saying, with respect to the rate question: "The Act does not require, and because of changing costs it would be illusory to require, that rates be fixed before construction begins." 83 U.S.App.D.C. at page 299, 169 F.2d at page 883. The rates in question in Panhandle Eastern were those which the pipeline proposed to charge its customers. Upon those rates the cost of construction of the pipeline would have an obvious bearing. It would therefore indeed be illusory for the Commission to require the company to specify its rates before the construction was even certified. Suppliers' rates are an altogether different matter. They determine the project's cost, rather than depend on it. It is not at all illusory, therefore, to ascertain what price the pipeline is to pay for gas before authorizing it to construct costly facilities for transporting the gas to market. Note also that the Commission, in Panhandle Eastern, did not authorize the operation of the project without a consideration of justness and reasonableness of the rates. It postponed a rate determination until after construction, but it also postponed operation until reasonable rates had been filed. In effect, it imposed a rate condition, leaving the specific amount to be determined after construction costs were ascertained.

Our language in Panhandle Eastern that "the Act does not require" a finding of "a satisfactory rate schedule" does not mean, when read in context,[29] that the Commission need not *consider* proposed rates as an element of both economic feasability and public convenience and necessity, in a case where the lawfulness of the proposed rates is substantially in question. Thus, though we also said the Act requires no finding as to financial ability, we obviously did not think that the Commission may certify a project without *considering* the applicant's financial ability to carry it out. A fair reading of our language in Panhandle Eastern is that the Act *expressly* requires only certain findings—that the applicant is able and willing to perform and that the public convenience and necessity require the proposed service— and that as to matters which are components of the two findings, no separate specific findings need be made, so long as they are reasonably proven in the record. Lawfulness of rates, no less

---

28. Supra note 21.

29. We said:
   "The Commission found that Michigan-Wisconsin is 'able and willing properly to do the acts and to perform the service proposed.' This finding, like that of public convenience and necessity, is expressly required by § 7(e) of the Act. We think it is also supported by substantial evidence. Panhandle says it is not supported by findings or proof of financial ability or a satisfactory rate schedule. The Act does not require such findings. The Commission did find, on the sufficient evidence, that Michigan-Wisconsin 'has secured substantial reserves of natural gas and has submitted reasonable proof of the financial and economic feasibility of its project.'" 83 U.S.App.D.C. at page 299, 169 F.2d at page 883.

than financial capacity, is a component of both of the expressly required statutory findings. The Commission may not make the statutory findings without considering each of their necessary components as to which substantial question exists.

I would set aside the order under review and remand the case to the Commission for further proceedings.